WILLARD K. TOM
General Counsel

DAVID M. NEWMAN (Calif. Bar #54218)
ERIC D. EDMONDSON (D.C. Bar #450294)
EVAN ROSE (Calif. Bar #253478)
KERRY O'BRIEN (Calif. Bar #149264)
Federal Trade Commission
901 Market Street, Suite 570
San Francisco, CA 94103
P: 415-848-5100; F: 415-848-5184
dnewman@ftc.gov; eedmondson@ftc.gov
erose@ftc.gov; kobrien@ftc.gov

RAYMOND E. MCKOWN (Calif. Bar #150975)
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
P: 310-824-4343 F: 310-824-4380
rmckown@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>COMMERCE PLANET, INC., a corporation,<br><br>and<br><br>MICHAEL HILL, CHARLES GUGLIUZZA, and AARON GRAVITZ, individually and as officers of COMMERCE PLANET, INC.,<br><br>Defendants. | Case No. SACV-09-01324 CJC (RNBx)<br><br>**REPLY OF FTC TO DEFENDANT GUGLIUZZA'S OPPOSITION TO MOTION IN LIMINE RE STEFANO VRANCA**<br><br>Hearing Date: May 16, 2011<br>Time: 3:30 p.m.<br>Place: Courtroom 9B, United States Courthouse, 411 West 4th Street, Santa Ana, CA |

Reply to Opposition to Motion in Limine re Stefano Vranca

1    In its Motion *in Limine* (Dkt. #97) to preclude the testimony of Defendant's

2    accounting expert, Stefano Vranca, the FTC argues that his tracing analysis is

3    irrelevant and, therefore, that his testimony cannot assist the trier of fact, as

4    required by FRE 702.  We also show that Mr. Vranca misrepresented his

5    credentials and failed to respond forthrightly to questions about the data upon

6    which he relied and to hypothetical questions designed to test his assumptions and

7    methodology.  Defendant's opposition (Dkt. #116) disputes these contentions.

8    **I.    No Court Has Imposed the Strict Tracing Requirements that Defendant Proposes as a Prerequisite for Individual Liability in a Case Brought by the Federal Trade Commission.**

9

10    Defendant argues that Mr. Vranca's tracing analysis is relevant, based on

11    the ruling in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 210, 212-14

12    (2002).  He claims that the FTC's ability to obtain consumer redress in an action

13    brought under Section 13(b) of the FTC Act is limited to its ability to trace

14    "particular funds or property in defendant's possession."  (Opposition at 3:17-18)

15    In particular, he cites to the Second Circuit's holding in *FTC v. Verity Int'l, Ltd.*,

16    442 F.3d 48 (2d Cir. 2006), *cert. denied* 2007 U.S. LEXIS 3024 (March 19, 2007).

17    His argument ignores nearly a decade of Ninth Circuit case law holding that –

18    contrary to *Verity* – redress is not limited by the amount of money that a defendant

19    may have received.  His argument also ignores the plain language of *Verity* and the

20    few cases that have followed it, none of which mandates the sort of strict tracing

21    analysis that Defendant proposes.

22    **A.    Defendant's Reliance on *Great-West Life* Is Misplaced.**

23    Defendant's reliance on *Great-West* for the proposition that a tracing

24    analysis is relevant in this matter misreads that case and ignores the distinction

25    between the ERISA statutory scheme and the FTC Act.  In *Great-West*, the

26    plaintiff insurance company sought to recover funds from the defendant, a

27    quadriplegic automobile accident victim.  Although those funds were held in trust

28    on the defendant's behalf, they had never come into her possession.  The plaintiff

invoked the private enforcement provisions of the Employee Retirement Income Security Act ("ERISA"), under which participants, beneficiaries, or fiduciaries of employee benefit plans may sue "(A) to enjoin any act or practice which violates * * * the terms of the plan, or (B) to obtain other appropriate equitable relief * * *." 29 U.S.C. § 1132(a)(3). The Court's interpretation of this provision was guided by its observation that "ERISA is a comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system." 534 U.S. at 209 (internal quotation marks and citation omitted). The Court also observed that "ERISA's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.* (emphasis in original; internal quotation marks and citations omitted).

Guided by these principles, the Court held that, because ERISA specifically permitted a party to seek "appropriate *equitable* relief" (emphasis added), plaintiffs were limited to seeking those forms of relief that would have been considered equitable at the time of the divided bench. The Court concluded that, because the funds that plaintiffs were seeking had never come into the defendant's possession, the type of restitution that the plaintiffs were seeking was legal, not equitable, and was not permitted by ERISA's limited grant of remedial authority. "Admittedly, our cases have not previously drawn this fine distinction between restitution at law and restitution in equity, but neither have they involved an issue to which the distinction was relevant." 534 U.S. at 214-15.

There are critical distinctions between the ERISA statutory scheme in *Great-West* and the enforcement scheme envisioned under Section 13(b) of the FTC Act. The Commission brings this case in the public interest; *Great-West* involved a private action. The Court's analysis in *Great-West* is dependent upon specific statutory limits set forth in ERISA, *see* 534 U.S. at 209, limits that have no application to a case brought under the FTC Act. Moreover, in *Great-West*, the

1   Court explained that, in a private action under ERISA, courts are limited to

2   remedies specifically set forth in that statute.  *Id.*

3        By contrast, when the Commission sues under Section 13(b) to combat

4   deceptive or unfair trade practices, the court may award complete relief, including

5   relief that might have been available in a court of law.  *Porter v. Warner*, 328 U.S.

6   395, 398-399 (1946); *Mitchell v. DeMario*, 361 U.S. 288, 291 (1960); *see United*

7   *States v. Sasso*, 215 F.3d 283, 289 (2d Cir. 2000) (citing *Porter v. Warner*, and

8   *Mitchell v. DeMario*, and holding that the principles in those cases apply when

9   interpreting the remedial provisions of the Racketeer Influenced and Corrupt

10  Organizations Act); *SEC v. Texas Gulf Sulphur*, 446 F.2d 1301, 1307 (2d Cir.

11  1971) (applying those principles to the interpretation of the remedial provisions of

12  the Securities Exchange Act of 1934).  Thus, the district court has inherent

13  authority to "give effect to the policy of the legislature," *Mitchell*, 361 U.S. at 292,

14  and the holding in *Verity* that *Great-West* governs cases brought under Section

15  13(b) is incorrect.

16      **B.    *Verity* and its Progeny Do not Require a Strict Tracing of Assets.**

17        Notwithstanding that *Verity* was wrongly decided in its application of

18  *Great-West* to cases brought under Section 13(b), a straightforward reading of the

19  Second Circuit's decision demonstrates that it does not compel a tracing analysis.

20  In *Verity*, the Second Circuit reversed a lower court's determination that the

21  economic recovery available to the FTC should be measured by the total amount

22  that consumers had paid for the defendants' services.  443 F.3d at 66-70.  Instead,

23  citing *Great-West*, the court held that the "appropriate measure for restitution is

24  the benefit unjustly received by the defendants."  443 F.3d at 67.  It noted that in

25  many cases "the defendant's gain will be equal to the consumer's loss because the

26  consumer buys goods or services directly from the defendant.  Thus, in many cases

27  it is not inaccurate to say that restitution is measured by the consumer's loss."  *Id.*

28  at 68.  The decision in *Verity* turned on the peculiar facts of that case, in which

1  purchasers of the defendants' adult services were billed on their telephone bills.

2  Several phone companies took their shares of the proceeds, and the remainder was

3  remitted to the defendants. *Id.* at 52-53. Under that fact pattern, the Second

4  Circuit held that the FTC was limited in its ability to seek consumer redress to the

5  amount of funds that had actually been received by defendants. *Id.* at 68. The

6  Court of Appeals remanded, instructing the district court "to consider how much

7  of [the sum paid by consumers] was in fact received by the defendants-appellants

8  and is therefore subject to an order of restitution." *Id.* The Second Circuit

9  pointedly "emphasize[d] that equitable restitution is not limited to an award of the

10  very funds that unjustly enriched the defendant and are still in the defendant's

11  possession." *Id.* at 67, n.10.

12      Defendant has not cited to a single case involving the FTC in which a

13  tracing analysis comparable to Mr. Vranca's was required. This is not surprising,

14  because *Verity* is not about identifying which assets are available for restitution;

15  rather, it is about determining the appropriate measure of restitution. Under

16  *Verity*, the "measure of damages" is the funds received by the defendants, with no

17  allowance for expenses or costs of doing business. *Id.* at 68. Thus, even if it were

18  appropriate to use a *Verity* analysis in this matter, and assuming the other

19  conditions for liability are met, the measure of consumer redress would be the

20  proceeds from the sale of the OnlineSupplier memberships, less any refunds to

21  consumers. The sort of strict tracing analysis that Mr. Vranca performed has

22  nothing to add to the Court's determination of that issue, and his proposed

23  testimony is irrelevant.

24      The *Verity* court did not address the question of the liability of individual

25  defendants, but cases following it have. In *FTC v. QT, Inc.*, 512 F.3d 858 (7th Cir.

26  2008), the Seventh Circuit upheld the trial court's rejection of the defendants'

27  argument that *Verity* limited consumer redress to the defendants' profits, rather

28  than the total amount received from consumers, *Id.* at 863, and explicitly

approved a finding that the individual president of the company was jointly and

severally liable for the entire amount of consumer loss. *Id.* at 864. The trial court

had considered the *Verity* argument and reconciled it with earlier Seventh Circuit

precedent to hold that the proper measure of redress is the net sales (sales less

refunds) of the product that were the subject of the violative conduct. *FTC v. QT,*

*Inc.*, 448 F. Supp.2d 908, 975 (N.D. Ill. 2006), *citing FTC v. Febre*, 128 F.3d 530,

534 (7th Cir. 1997).

Similarly, in the Second Circuit, the trial court in *FTC v. Bronson Partners,*

*LLC*, 674 F. Supp.2d 373 (D. Conn. 2009), *appeal docketed*, No. 10-878 (2d Cir.

March 8, 2010), rejected the defendants' arguments that restitution should be

limited to the amount of their "undeserved profit" and should not include "money

spent on certain operating expenses." *Id.* at 379. Significantly, the *Bronson*

*Partners* court treated the problem as one of the appropriate measure of restitution,

not a question of asset tracing:

> The consumer's property, *received* by the defendant, is an appropriate
> measure of restitution; therefore, I must calculate a restitution award
> measured by the defendants' unjust gains.

*Id.* at 379. The court rejected the defendants' argument that *Great-West* and

*Verity* compelled it to limit its award to consumer dollars "in their possession,"

which would have credited them for operating expenses, costs of goods sold, and

the like. *Id.* at 383. Finally, the court held the corporate and individual

defendants "jointly and severally liable for the full restitution amount." *Id.* at 392.

## C.    The Majority of Circuits Have Refused to Limit Restitution as the Second Circuit Did in *Verity*.

As in the Ninth Circuit cases cited in our opening brief,[1] the majority of

circuits have held, even post-*Great-West*, that the appropriate measure of

---

[1]    *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (proper
measure of restitution is full amount lost by consumers, not defendant's profits).

restitution in an FTC action is the amount paid by consumers to defendants. For example, in *FTC v. Direct Mktg. Concepts*, 624 F.3d 1 (1st Cir. 2010), the First Circuit considered and rejected a *Verity* approach. *Id.* at 15 (*Verity*'s "limited approach" does not apply; court followed the "general rule"); *see also, FTC v. Freecom Communications*, 401 F.3d 1192, 1206 (10th Cir. 2005) (gross receipts the proper beginning point for calculation of sanctions); *FTC v. QT, Inc.*, 512 F.3d at 863; *FTC v. Transnet Wireless Corp.*, 506 F. Supp.2d 1247, 1271 (S.D. Fla. 2007) (in deceptive sales scheme, restitution may be measured by loss suffered by victims); *FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp.2d 1167, 1212 (N.D. Ga. 2008), *aff'd per curiam* 356 Fed. Appx. 358, 2009 U.S. App. LEXIS 27388 (11th 2009), *cert. denied* 131 S. Ct. 505 (2010) (court looks to price paid by consumer and does not deduct any value received). In *FTC v. Kennedy*, 574 F. Supp.2d 714 (S.D. Texas 2008), the court explicitly rejected the *Verity* analysis in finding the defendant "jointly and severally liable to the consumers for all their damages." *Id.* at 724.

Similarly, most courts have held individual defendants jointly and severally liable for consumer losses. *FTC v. Direct Mktg. Concepts*, 648 F. Supp.2d 202, 214 (D. Mass. 2009), *aff'd* 624 F.3d 1 (1st Cir. 2010) (courts "routinely hold" corporate and individual defendants jointly and severally liable where those defendants are directly responsible for the acts or practices violating FTC Act); *Transnet Wireless*, 506 F. Supp.2d at 1271 (defendants who have violated Section 5 of the FTC Act can be held jointly and severally liable for total amount of consumer injury); *Kennedy,* 574 F. Supp.2d at 724. In *FTC v. J.K. Publ'ns*, 2009 U.S. Dist. LEXIS 36885 (C.D. Cal. 2009), this Court held that the "applicability of joint and several liability is entirely inconsistent with the proposition that traceability is required," adding that "adopting a traceability requirement would lead to absurd results." *Id.* at *15. Thus, tracing cannot be a predicate for imposing individual liability under Section 13(b). Mr. Vranca's proposed

1    testimony is irrelevant and cannot assist the trier of fact.

2    **II.    Stefano Vranca Misrepresented his Credentials.**

3            Notwithstanding his protests to the contrary, the facts are clear that, in his

4    resume, Mr. Vranca claims to have received the equivalent of a license as a

5    Certified Public Accountant, when the plain facts are that he has what is more

6    nearly the equivalent of a high school (or charitably, a community college)

7    diploma.[2]  He attempts to explain away the discrepancy by suggesting that his

8    Ragioniere e Perito Commerciale diploma, which he received at the age of 19

9    upon graduation from a technical high school, would have permitted him to

10   practice as an accountant in Italy, and, therefore, was the equivalent of a CPA.

11   (Vranca Decl. ¶ 18)   But the representation that the reference to his diploma –

12   which he does not call a diploma – as a "CPA equivalent in Italy/EU" is not a

13   statement about what he might have been qualified to do in the early 1990's.

14   Rather, it is a description, for the benefit of courts and clients, of his certifications,

15   and the CPA-equivalency claim is meaningless other than as a representation that

16   he possesses education, experience and demonstrated proficiency comparable to

17   an American CPA.  Even by his own admission, that is clearly not the case.

18           As he concedes, when he graduated in 1991, in order to practice as an

19   accountant in Italy, in addition to the diploma, "an individual simply would have

20   had to spend three years of apprenticeship with a professional who was already

21   registered in the Albo of Ragioinieri e Perito commerciale and then take a simple

22   test to be registered in the same Albo."  (Vranca Decl. ¶ 18) In his deposition

23   testimony, however, he concedes that he did neither.  (Vranca Depo. at 16:23-

24   17:11), He, therefore, could not have been registered in Italy and could not have

25   practiced as an accountant.  Moreover, he does not offer any evidence or statement

26   _____

27           [2]    The FTC does not challenge Mr. Vranca on the basis of his overall
     experience.  Rather, it challenges him based on the affirmative misrepresentation
28   of his credentials.

1  about the scope of the accounting courses he completed before his graduation

2  beyond the conclusory statement that his "diploma was considered the equivalent

3  of the CPA and its course work in Italy" (Vranca Decl. ¶ 18), and it is difficult to

4  imagine that his secondary school course work was in fact the equivalent of the 48

5  semester hours of college-level accounting and business courses that are required

6  for taking the CPA exam.[3]  Whatever his overall qualifications may be, it is clear

7  that Mr. Vranca does not possess anything that is the equivalent of a CPA.

8  **III.    Mr. Vranca Was Persistently Evasive or Nonresponsive when Asked**
       **about the Evidentiary Basis for his Opinions and when Asked**
9       **Hypothetical Questions to Test his Methodology and Assumptions.**

10         As we note in our Memorandum of Points and Authorities (Dkt. #97), Mr.

11  Vranca was asked throughout his deposition to identify the data upon which he

12  had relied, and he persistently answered only in vague and evasive terms:

13         "all of the documents I've relied on are documents that were provided to me

14         by counsel.  And my understanding is those were all documents provided to

15         counsel by the FTC" (Vranca Depo. at 36:3-21)

16         "We relied on the entire – you know, we looked at pretty much the entire

17         universe of documents provided to us."  (Vranca Depo. at 37:2-5)

18         "we and my team have looked at the entire universe of data made available

19         to us."  (Vranca Depo. at 38:15-17)

20         "I looked at the entire of – my team and I looked at the entire documentation

21         that was provided to us."  (Vranca Depo. at 39:24-40:1)

22         "I've looked, my team and I have looked through numerous

23         documentations, and I'm sure through our research we found documents

24         specific to the description of what Consumer Loyalty Group was and we

25         used that."  (Vranca Depo. at 53:1-5)

26         Mr. Vranca claims that he did not refuse to answer any questions, but that

27  _____

28  [3]  "Uniform CPA Examination Handbook," California Board of Accountancy
     at 3-6, available at *http://www.dca.ca.gov/cba/publications/exambk1.pdf.*

1    he "refuted opposing counsel's attempt to make me state that I relied upon any

2    'single' document . . .as that simply is not the case."  (Vranca Decl. ¶ 22) But what

3    is not the case is his assertion that he attempted to be responsive.  Appendix A to

4    his original report describes the information that he had at his disposal.  It lists

5    nearly two dozen specific documents and corporate accounts, and then describes a

6    "data room" that contained "thousands of documents . . . in addition to the items

7    listed above, including but not limited to e-mail correspondence, internal financial

8    schedules and projections, general company information, etc...."  (Vranca Expert

9    Report Appendix A, Dkt. #97 at 23)  He then adds that, in addition to the

10   documents listed above, "we received and reviewed documents and data provided

11   to us by Counsel from a hard drive with voluminous financial and background

12   information for the company."  (*Id.*)  In that context, Mr. Vranca was not being

13   asked to identify "single" documents, but to narrow the scope of the data upon

14   which he relied for particular opinions to particular documents or sets of

15   documents.  His persistent response was essentially that there was a room-full of

16   documents, and what he relied on was in there someplace.

17        Mr. Vranca was also evasive when asked hypothetical questions that were

18   designed to test his assumptions and methodology.  For example, he had opined

19   that commingling revenue streams from different products or subsidiaries would

20   make tracing impossible.  He was asked whether it would affect his opinion if it

21   turned out that Legacy Media derived its entire income from servicing Consumer

22   Loyalty Group, the subsidiary that actually sold the OnlineSupplier membership.

23   Over nearly three pages of transcript, he simply refused to accept the premise of

24   the hypothetical.  (Vranca Depo. at 56:17-59:1)

25        Mr. Vranca's evasions deprived the FTC of the ability to verify the data

26   upon which his report (and subsequent) testimony are based and to confirm the

27   soundness of his assumptions and methodology.  He simply has not satisfied the

28   obligation to describe the facts and data he had considered in forming his opinions,

1   and, on that basis, should be barred from testifying.

2   **IV.     Conclusion**

3          The most persuasive reason to preclude Mr. Vranca from testifying is that

4   his proposed testimony is simply irrelevant.  His exaggeration of his credentials

5   and his persistent lack of responsiveness weigh heavily against his credibility, and

6   the latter deprived the FTC of the ability to probe both his methodology and his

7   assumptions.  For all of these reasons, we respectfully request that the Court grant

8   the FTC's *Motion in Limine* to preclude Stefano Vranca from testifying.

9   Dated: April 28, 2011                    Respectfully submitted,

10

11                              */s/ David M. Newman*
                                DAVID M. NEWMAN
12                              ERIC D. EDMONDSON
                                EVAN ROSE
13                              KERRY O'BRIEN
                                Federal Trade Commission
14                              901 Market Street, Suite 570
                                San Francisco, CA 94103
15                              P: 415-848-5100; F: 415-848-5184
                                dnewman@ftc.gov;eedmondson@ftc.gov;
16                              erose@ftc.gov; kobrien@ftc.gov

17                              RAYMOND E. MCKOWN
                                Federal Trade Commission
18                              10877 Wilshire Blvd., Suite 700
                                Los Angeles, CA 90024
19                              P: 310-824-4343; F: 310-824-4380
                                rmckown@ftc.gov
20
                                Attorneys for Plaintiff
21                              Federal Trade Commission

22

23

24

25

26

27

28