Michael A. Piazza (SBN 235881)
Email: piazzam@gtlaw.com
Wayne R. Gross (SBN 138828)
Email: grossw@gtlaw.com
Alan A. Greenberg (SBN 150827)
Email: greenbergal@gtlaw.com
GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, California 92612
Telephone:   (949) 732-6500
Fax:         (949) 732-6501


Attorneys for Defendant Charles Gugliuzza

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> COMMERCE PLANET, INC., a corporation, and MICHAEL HILL, CHARLES GUGLIUZZA, and AARON GRAVITZ, individually and as officers of COMMERCE PLANET, INC., <br><br> Defendants. | CASE NO. SA CV 09-01324 CJC (RNBx) <br><br> **DEFENDANT'S TRIAL BRIEF** <br><br> Judge: Hon. Cormac J. Carney <br> Dept.:  9B <br> Date:   January 31, 2012 <br> Time: 8:30 a.m. |

OC 286,862,798v2

# **TABLE OF CONTENTS**

Page

I.      SUMMARY OF LEGAL ISSUES TO BE TRIED.................................. 1

II.     WHAT THE EVIDENCE WILL SHOW.......................................... 3

        A.      Background of Charles Gugliuzza and Consulting Work............................ 3

        B.      Gugliuzza's Role as President........................................ 7

        C.      Online Supplier Product and the Infomercial................................ 8

        D.      Negative Option Marketing........................................ 9

        E.      Online Supplier's Webpages........................................ 10

        F.      Confirmation Email........................................ 11

        G.      Gugliuzza Hires In-House Counsel.................................... 12

        H.      Chargebacks and Affiliate Marketing Fraud............................ 13

        I.      Gugliuzza Leaves Position ........................................ 15

        J.      FTC Meeting With Gravitz and Settlement ................................ 16

        K.      Complaint and Misleading Attachment ................................ 16

        L.      Deposition of Former Chairman of the Board ............................ 18

        M.      Deposition of Chief Technology Officer ................................ 19

        N.      Retention of Jennifer King by FTC.................................... 20

        O.      Not a Single Percipient Witness Believed Terms Were Deceptive ............ 25

        P.      Expert Testimony Further Establishes That Disclosures Were Adequate.. 30

III     CONCLUSION........................................ 32

OC 286,862,798v2

Pursuant to Local Rule 16.1(f)(9)(a), Defendant Charles Gugliuzza ("Defendant"), by counsel, hereby respectfully submits his trial brief setting forth his position with respect to the legal issues to be tried and what the evidence will establish.

## I.    SUMMARY OF LEGAL ISSUES TO BE TRIED

The Plaintiff Federal Trade Commission ("FTC") is suing Defendant Gugliuzza for relief under Section 13(b) of the FTC Act, 15 U.S.C. §53(b), alleging that Gugliuzza violated Section 5(a) of the FTC Act, 15 U.S.C. §45(a).  The Plaintiff asserts two counts in its First Amended Complaint.  First, the Plaintiff asserts that Commerce Planet engaged in deceptive acts or practices by failing to disclose, or to disclose adequately, the material terms and conditions of its offer of the "Online Supplier" program.  [FAC, ¶¶48-50].  Second, the Plaintiff asserts that Commerce Planet engaged in an unfair practice by allegedly assessing monthly charges against consumers' credit cards without obtaining the express, informed consent of the consumers to assess such charges.  [FAC, ¶¶51-53].

The Plaintiff alleges that the disclosures of the terms and conditions were placed "below the fold" so that consumers could not see them without scrolling, and were also placed in a linked Terms of Membership webpage.  [FAC, ¶¶29-32].

An act or practice is "deceptive" if: (1) there is a representation, omission, or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material. *See FTC* v. *Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

An act or practice is "unfair" if (1) it causes substantial injury to consumers, (2) which is not reasonably avoidable by consumers themselves, and (3) is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. §45(n); *FTC* v. *J.K. Pub. Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

The FTC has the burden to prove facts supporting each element of each of its claims and to support the remedies it seeks against Gugliuzza. *See FTC* v. *Freecom*, 401 F.3d 1192, 1204-05, 1207 (10th Cir. 2005) (FTC must show elements for injunctive relief and consumer redress).

OC 286,862,798v2

Where otherwise appropriate, an individual defendant may be subject to injunctive relief for corporate violations of the FTC Act if the individual "participated directly in" the acts or practices in question or "had the authority to control them." *FTC* v. *Garvey*, 383 F.3d 891, 900 (9th Cir. 2004).

Permanent injunctive relief under section 13(b) is appropriate only when a violation is ongoing or there is a cognizable danger of recurring violations. *See FTC* v. *Braswell*, No. 03-3700, 2005 WL 4227194 at * 12 (C.D. Cal. Sept. 27, 2005); *FTC* v. *National Urological Group. Inc.*, 645 F. Supp. 2d 1167, 1209 (N.D. Ga. 2008); *see also FTC* v. *Evans Prods. Co.*, 775 F.2d 1084, 1087-88 (9th Cir. 1985) ("[a]s a general rule, past wrongs are not enough for the grant of an injunction; an injunction will issue only if the wrongs are ongoing or likely to recur." (internal quotation omitted)).

To hold an individual liable to pay restitution for a corporate violation of FTC Act Section 5, the FTC must show that the individual had actual knowledge of the material misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of truth. *FTC* v. *Garvey*, 383 F.3d 891, 900 (9th Cir. 2004); *FTC* v. *Network Serv. Depot, Inc.*, 617 F.3d 1127, 1138 (9th Cir. 2010).[1]

As discussed herein, every element of the FTC's claims will be shown at trial to be without factual basis.  The practices of Commerce Planet (or to be accurate, of its subsidiaries) were neither unfair nor deceptive, the disclosures of the terms and

---

[1]  Furthermore, as the Defendant argued in his motion for summary judgment, which the Court denied, the United States Supreme Court has held that for restitution to lie in equity, the action must seek to restore to the plaintiff specific, traceable funds or property in the defendant's possession (*Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U.S. 204, 213-14, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002); *Pereira* v. *Farace*, 413 F.3d 330, 340 (2d Cir. 2005)), and the limitations inherent in equitable restitution mean that under section 13(b), the FTC can only recover from a defendant the unjust gain that can be traced from consumers to that defendant. *See FTC* v. *Verity Int'l. Ltd.*, 443 F.3d 48, 67-68 & n. 10 (2d Cir. 2006); *see also, FTC* v. *Bronson Partners LLC*, 654 F.3d 359 (2d Cir. 2011); *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U.S. at 213-14.

---

2

OC 286,862,798v2

conditions were appropriately communicated to customers, and Gugliuzza had no knowledge of material misrepresentations, was never recklessly indifferent to the truth or falsity of any misrepresentation, and had no awareness of any high probability of fraud nor did he engage in intentional avoidance of the truth.  Furthermore, Gugliuzza stepped down as President of Commerce Planet months before the FTC ever made known that there was even an investigation, and more than two years before this lawsuit was filed.  There is no allegation of any continuing violation, and there is no likelihood whatsoever of Gugliuzza ever engaging in a violation in the future.

In addition to contesting the FTC's claims, Gugliuzza also asserts the affirmative defenses of advice of counsel, good faith, and mootness.

To establish good faith reliance on advice of counsel as an affirmative defense, a defendant must show: (1) a complete disclosure to counsel; (2) a request for counsel's advice as to the legality of the contemplated action; (3) receipt of  advice that it was legal; and (4) reliance in good faith on that advice.  *SEC* v. *Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985); *SEC* v. *Savory Industries, Inc*., 665 F.2d 1310, 1314 n. 28 (D.C. Cir. 1981).

With regard to the defense of good faith, in *FTC* v. *Garvey*, 383 F.3d 891, 900 (9th Cir. 2004), defendant was held not to be personally liable where he was shown to have a good faith belief in the manner in which he marketed the product.

With regard to mootness, as discussed above, the FTC must prove an ongoing violation or a danger of recurrence.  The FTC will prove neither, and Gugliuzza will show that there is no danger of recurrence and no necessity for any injunctive relief.

II.   WHAT THE EVIDENCE WILL SHOW

A.   Background of Charles Gugliuzza and Consulting Work

In 1999, Gugliuzza, then 24-years-old, graduated from Loyola Law School.  (Exh. 2000).  He passed the California bar exam but chose to go into business with a law school classmate.  (*Id.*)  They and others formed a business called eBatts, which manufactured and sold rechargeable batteries for laptops, camcorders, cell phones and digital cameras.

3

OC 286,862,798v2

(*Id.*)  Gugliuzza served as the Chief Operating Officer of the company, which was later acquired by Battery-Biz.  (*Id.*)  The company, which did not utilize negative option marketing in the sale of its batteries, became quite successful, ultimately serving as the exclusive manufacturer and distributor for Duracell's rechargeable camcorder and digital camera product line.  (*Id.*)  Gugliuzza thereafter sold his minority interest in the company to pursue other opportunities.  (*Id.*)

Gugliuzza began doing consulting work for various companies and, in May 2005, did so for a company called NeWave, a publicly traded company with an independent board of directors, thousands of shareholders, multiple subsidiaries with various office locations, and hundreds of employees.  (*Id.*)  He was introduced to one of the NeWave board members through a law school classmate.  (*Id.*)  The company's board of directors asked him to perform a 30-day assessment of the company.  (*Id.*)  He was then 30-years-old and had never previously performed a corporate assessment, which he made clear to the board.  (*Id.*)  Based on his previous success at eBatts, the board nonetheless sought his assistance. (*Id.*)

Gugliuzza purchased a book on Six Sigma analysis[2] and performed an assessment regarding the strengths, weaknesses, and performance metrics of the company.  (*Id.*)  His assessment entailed both interviewing management, staff members, and directors, as well as reviewing operations and financials.  (*Id.*)  He thereafter drafted a 78-page report that contained his assessment and conclusions.  (Exh. 6).  As to the strengths of the company, he pointed to, among other things, the company's "[e]xcellent revenue generating ideas," "[p]ositive and highly motivated management team," "[l]arge scale sales operations," and "proven business models" that "can be improved upon for success."  (Exh. 6 at 9).

---

[2] The reference work used by Gugliuzza was "<u>What is Six Sigma?</u>" by Peter Pande and Larry Holpp.  Six Sigma is a business management strategy originally developed by Motorola in 1986 for the purpose of achieving sustained quality improvement by a commitment from the entire organization, including top management.  It is now widely used in many sectors of industry.

OC 286,862,798v2

As to the weaknesses, he informed the board that "[m]anagement currently lacks experience and skills to effectively operate [the] company or implement change," and the company had "poorly developed" company infrastructure, "[i]nsufficient cash reserves and organic profits to sustain operations," and "[a] lack of value added products and services that produce high profit margins and customer retention." (*Id.*)

In discussing the company's weaknesses, the report placed great emphasis on the responsibility of management, criticizing the current management team as follows:

> All managers ultimately exhibit some belief in the notion that Newave sells "crap in a box". Although there is a strong overall belief in the company, the managers do not associate the need for quality products in order to achieve success for the organization. In the mind of most managers, the customer base is comprised of low level individuals that will buy anything, as long as it is presented properly. The problem is that these "low level" consumers quickly realize that they have been billed a considerable sum of money for little actual returned value and cancel the billed program or product. Not only does this result in lost revenue, but this also creates additional processing and operational costs.

(Exh. 6 at 8).

To remedy this problem and the others cited above, he recommended various ways that the company, as well as its products and services, could be improved. For example, he explained that a "new phone system and proper phone support should be immediately procured" because "phones are the lifeblood of this company." (Exh. 7 at 65). His report admonished the board of directors as follows: "Calls cannot be improperly routed, inaccurately measured or dropped completely, which is often the case." (*Id.*)

His report also placed great emphasis on the need for improved customer service. (Exh. 7 at 63). He explained that the level of customer service for both the "product and and program knowledge is completely unacceptable." (*Id.*) To test customer service, he called customer service himself, as set forth in his report:

OC 286,862,798v2

I placed a call to the customer service department.  The Online Supplier CSR had never even viewed the mailer that I had received and was unable to help me locate my user id.  The service representative was not familiar with the user interface I was navigating to set up my store and was unable to communicate instructions to me.  The representative did not understand the distinction between domain name registration and website submission to the various search engines.  After experiencing the support process I understand why Newave's typical customer cancels the program within a few weeks.

(Exh. 6 at 63).

He made various recommendations to improve customer service, which included providing company compliance officers with performance-based incentives to "motivate the compliance officers to intently listen to each call" to identify "poor performance." (Exh. 6 at 68).  As to the future hiring of customer service representatives, the report explained the type of employees the company should hire as follows: "I recommend individuals with a solid education, desire and work ethic as opposed to other qualifications others may deem valuable."  (Exh. 6 at 36).

In the concluding section of his detailed assessment, Gugliuzza recognized that the candid assertions and recommendations contained in his report "may not be well received by investors, board members and management."  (Exh. 6 at 78).  He nonetheless felt it imperative to provide the board with his honest perceptions.  (*Id.*)  He summarized his final thoughts as follows:

The company clearly needs to focus on its internal infrastructure and operative procedures to support future growth.  A philosophical change must be implemented stressing actual value as opposed to perceived value.  It is encouraging to see that several of my recommendations have already been implemented throughout the duration of my consulting period.  I believe that the company can achieve the goals of the investors and board members if they are clearly documented and communicated to the management team.

6

OC 286,862,798v2

1   　　　　The management team is highly motivated and hard working.  They

2   can execute upon well organized plans if provided the proper guidance and

3   incentives.

4   (*Id.*)

5   　　　　In sum, Gugliuzza's extensive performance assessment, closely examining the

6   operations of NeWave and its subsidiaries, emphasized that the company needed to better

7   train its management, enhance its infrastructure, add value to its products, and improve

8   customer service.  Michael Novielli, the chairman of the Board of Directors, was

9   extremely impressed with the report and caused the board to retain Gugliuzza to perform

10  additional consulting work and to implement some of the recommendations in his

11  assessment.  Gugliuzza agreed to the extension of the consulting work, but did not plan

12  on working exclusively on this project for the long-term, as reflected by the fact that he

13  resided in Orange County and worked out of a corporate office center in Ladera Ranch,

14  which is more than 150 miles from NeWave's corporate office in Santa Barbara.

15  Additionally, Gugliuzza never consulted for, nor was employed by any of NeWave's

16  subsidiaries, including Consumer Loyalty Group, which was the subsidiary that sold the

17  Online Supplier product.  During his work as a consultant, NeWave, in June 2006,

18  changed its name to Commerce Planet.

19  　　　　B.　　Gugiluzza's Role as President

20  　　　　Gugliuzza served as a consultant for Commerce Planet until September 2006,

21  when the board decided to make him president.  (Exh. 2000).  Michael Hill, who co-

22  founded the company with Aaron Gravitz in 2003, retained the title of chief executive

23  officer and continued to be significantly involved in the day-to-day operations of the

24  company and its subsidiaries.  Hill additionally served as the sole board member of each

25  of the subsidiaries, each of which had its own president, staff, and physical location.

26  　　　　Gugliuzza, as president of Commerce Planet, focused on high-level business

27  issues, including mergers and acquisitions.  Indeed, Gugliuzza spent much of his time on

28  the acquisition of three subsidiaries -- OneSource Imaging, Interaccurate, and Iventa --

and pursuing potential acquisitions of several additional companies.  His work in this area, which included doing due diligence in connection with each potential acquisition, occupied a substantial amount of time.  During his 14 months as president, Gugliuzza also met with the board of directors, conducted shareholder meetings and gave more than 30 investor presentations.  Such presentations led to the successful investment of almost $10 million by several reputable institutional investment funds.

### C.   Online Supplier Product and the Infomercial

In 2004 -- long before Gugliuzza commenced his work as a consultant for NeWave -- a subsidiary of NeWave began to sell the Online Supplier product.  (Exh. 2000).  The product evolved to include, among other things, an information kit with tips for marketing and selling products online, hosting of the member's website, access to web-builder software to create and maintain a webstore, access to a large variety of wholesale products that could be marketed through the webstore (although the member could source products from any source), drop-ship fulfillment of the products, and a merchant account enabling the member to accept credit card purchases from customers.  (*Id.*)

At all times, Gravitz was the person in charge of marketing Online Supplier.  By the time NeWave's board of directors hired Gugliuzza to serve as a consultant in May 2005, Gravitz had decided to market the product through an infomercial starring Bob Eubanks.  In preparing for the infomercial, the company sought testimonials from OnlineSupplier customers, including Eric and Lucia Carter.  (Exh. 2004).  They provided a written testimonial that reads in pertinent part:

A huge selling point was the option of having a fully operational website.  It's included in the service, and Onlinesupplier does all of the inventory maintenance.  We also have the ability to make it product specific to our store.  It's awesome to be able to go in and make changes at anytime we want.  That's not all, we can sell other items on the site that Onlinesupplier doesn't carry.  In our case, we have an entire furniture line that comes from a different warehouse, sold on our website.  This opportunity is endless for

OC 286,862,798v2

us, and there is no pressure or quotas to meet.  We have never experienced a shipping problem, and when there was a problem with a specific product, Fulfillment took care of it.  Onlinesupplier does a great job making our company look great.

(*Id.*)  Gugiliuzza, in conducting his performance assessment, was familiar with these testimonials, as well as the infomercial that was thereafter created in which Eric Carter was featured.  In fact, Gugliuzza cited the infomercial in his performance assessment.  (Exh. 6 at 10, 67, 69, 72).

> D.   <u>Negative Option Marketing</u>

The Online Supplier product, from its inception in 2004, has always been sold pursuant to a negative option plan.  Ken Eisner, an e-commerce expert, will testify that negative option marketing ("NOM") has been around for nearly a century, originating in the 1920s with the launching of the Book-of-the-Month Club.  Book-of-the-Month members were mailed monthly book selections and could either purchase the books or return them to the company.  Today, companies are using NOM to sell a wide array of products and services, including buying clubs, website design services, dietary supplements, books, magazines, and office supplies.

Negative option plans are beneficial for consumers, as well as businesses.  Companies benefit by lowering costs through better inventory management and avoidance of costs related to renewals, including expensive mailings.  Consumers benefit from the convenience of uninterrupted service of product shipments, as well as an easy renewal process.  Consumers who enroll in free-to-pay or nominal free-to-pay programs also benefit by being able to examine a product or service before incurring substantial fees, or in some cases, receive free gifts regardless of whether they participate in the program.  Additionally, since the company offering the NOM is able to lower its ongoing marketing and billing costs to the consumer, such savings may be shared with the consumer.

OC 286,862,798v2

E.    <u>Online Supplier's Webpages</u>

Aaron Gravitz, along with Michael Hill, was a company founder. (Ex. 25). Since founding the company in 2003 until his departure from the company in 2008, Gravitz was responsible for marketing the products of the company's subsidiaries, including the Online Supplier product. (*Id.*) Starting in 2004, Gravitz caused the product to be sold through telemarketing as well as through online sales. (*Id.*) In 2005, he also produced an infomercial. (Exh. 6).

In 2005, he also, based on the recommendation of an acquaintance who did not work for NeWave/Commerce Planet or its subsidiaries, created and implemented a "cost per acquisition" marketing model in which "affiliate marketers" (i.e., third party online advertising companies) were paid by NeWave/Commerce Planet for each customer referred by that marketer who signed up for Online Supplier. (Exh. 2000). By mid-2005, Gravitz also implemented a program of having online "affiliate marketers" engage in online advertising to drive traffic to Online Supplier webpages controlled by Consumer Loyalty Group. (*Id.*) The webpages were created by Gravitz together with graphics designers, and were approved for legal compliance by a company attorney named Jeff Conrad. (*Id.*)

The Online Supplier website disclosed the negative option and the membership fee. For example, on the first of two sign-up pages (where consumers provided address information), consumers were informed that "[b]y submitting this form you are accepting and agreeing to . . . the <u>Terms of Membership</u> of this Web Site" and provided a hyperlink to those terms. (Docket #1 (Complaint ("Compl.")) Ex. 2 (underline in original).) The terms of membership described the negative option and the monthly membership fee:

> If you do not contact our customer service to cancel your OnlineSupplier.com membership within 7 days, you will automatically be charged a monthly membership fee of $59.95, and you will be charged this monthly fee every 30 days thereafter until you cancel your membership.

(Compl. Ex. 3).

OC 286,862,798v2

1    The second sign-up page (where consumers entered credit card information) yet

2  again disclosed the negative option and the membership fee:

3    By submitting this form, you agree to the Privacy Policy of this Website, the

4    Onlinesuppplier.com free trial including the complete Terms and Conditions

5    of the trial membership, the $1.95/$7.95 shipping and handling, and the

6    following statement: "I UNDERSTAND THAT THIS CONSUMER

7    TRANSACTION INVOLVES A NEGATIVE OPTION, AND THAT I

8    MAY BE LIABLE FOR PAYMENT OF FUTURE GOODS AND

9    SERVICES UNDER THE TERMS OF THIS AGREEMENT FOR $59.95

10    PER MONTH IF I FAIL TO NOTIFY THE SUPPLIER NOT TO SUPPLY

11    THE GOODS OR SERVICES DESCRIBED." . . .

12  (Compl. Ex. 2 (capitals and underlining in original)).

13    F.    Confirmation Email

14    In addition to the notification of the negative option program in the webpages

15  themselves, the company would send customers an email verification on the same day

16  such customers signed up for the service to the email address the customer provided

17  during the sign-up process.  (Exh. 2014).  The notification read in pertinent part:

18    Welcome to the Online Supplier program.  Whether you are

19    looking to make money part-time or full-time, Online Supplier is

20    committed to making you a success.  Online supplier provides you

21    with access to thousands of brand name products and a web based

22    tutorial detailing how to set up your online business and your own

23    web store.

24    . . .

25    Your Auction Success Kit will arrive in the mail shortly.  It will

26    provide you with immediate access to our members only website

27    where you can choose from thousands of brand name products access

28    to our online tutorial and build your own webstore.

OC 286,862,798v2

1        Your kit contains everything you need to get started right away,

2   including login information to our members-only web site www.

3   onlinesupplier.com.  After logging in, you will be granted access to

4   build your own web store and gain access to discounted brand name

5   products.  After your 7-day trial, you will be billed the low monthly

6   fee of $49.95 each month unless you cancel.

7        For more information, assistance or account modifications,

8   please don't hesitate to contact our member service department by

9   calling 1-800-831-3952 toll-free or 1-805-567-0113.

10  Our hours of operation are Monday through Friday 7 am to 7pm and

11  Saturday and Sunday from 8am to 4pm US/Pacific time.

12  (*Id.*)

13      G.   <u>Gugliuzza Hires In-House Counsel</u>

14      Up until the time Gugliuzza became president in September 2006, the company

15  had been using Jeff Conrad as its principal outside counsel.  (Exh. 2000).  After

16  becoming president, Gugliuzza immediately commenced a search for in-house counsel,

17  interviewed applicants, and in December 2006, selected Paul Huff, an experienced

18  lawyer in both litigation and corporate law.  Gugiliuzza caused the company to hire Huff,

19  among other things, to be responsible for compliance with applicable government

20  regulations.  (*Id.*)  Indeed, shortly after hiring Huff, the company sent him to an FTC

21  workshop in Washington D.C.  Upon returning to the office, Huff made

22  recommendations on how the Online Supplier pages could be improved.  (*Id.*)  Huff's

23  recommendations were adopted by the company to his satisfaction.  Indeed, none of the

24  numerous percipient witnesses deposed in this matter has testified that they believed,

25  either contemporaneously or now, that the disclosure of the terms and conditions were

26  unclear to customers or in violation of any laws or regulations.  (*See infra.* Paragraph

27  "O").

28

OC 286,862,798v2

H.   Chargebacks and Affiliate Marketing Fraud

In the period of late 2006 into 2007, Consumer Loyalty Group (the subsidiary that owned and operated Online Supplier) experienced a surge of credit card chargebacks that were very costly to the company.  Chargebacks occur when a customer asks his or her credit card bank to cancel a charge on the customer's credit card account.  The credit card companies impose steep costs and penalties on businesses that experience high chargeback rates.  Such costs and penalties could be as high as $400 per order.  Since Online Supplier's monthly charges ranged from $29 to $59, the costs and penalties from chargebacks were quite harmful to the company.

This surge of chargebacks was caused by the company's increased use of so-called "affiliate marketers" under the leadership of Aaron Gravitz.  These third-party "lead generation" advertising companies were engaged by Legacy Media (Gravitz's company) to drive traffic to Online Supplier's website.  Unfortunately, many of these affiliate marketers engaged in fraudulent and abusive practices in an attempt to increase their compensation for submitting poor quality orders.  One practitioner of such affiliate marketing fraud was ValueClick, Inc., which was later charged by the FTC with deceptive advertising by use of false promises of "free" gifts to induce consumers to subscribe to third-party offers.  ValueClick paid $2.9 million to settle the FTC's charges.  (Exhibit 241).  Frequently, the consumers who subscribed to Online Supplier through affiliate marketers such as ValueClick, had no real interest in Online Supplier or the other offers presented by ValueClick, and were simply trying to obtain their "free" gift from ValueClick.  It is likely that such consumers never bothered to read the terms of the offers.

Furthermore, ValueClick and other affiliate marketers used unapproved email solicitations and order pages, so that consumers ordering through such marketers never even viewed the approved Online Supplier webpages.  Unbeknownst to Commerce Planet, affiliate marketers also engaged in such practices as submitting stolen credit card information and prepaid credit cards with low limits that would be declined when

13

OC 286,862,798v2

charged for monthly subscriber fees.  Commerce Planet and its subsidiaries, upon discovery of such abuses, attempted to stop them at every turn, and in several cases attempted to hold the affiliate marketers financially responsible for the havoc they caused, including the increased chargebacks and resulting penalties imposed by Visa and Mastercard.  (*See*, e.g., Exhibits 239, 240, 242, 243, 244, 245, 246).

Consumer Loyalty Group took strong measures to reduce chargebacks, and Gugliuzza was supportive of these efforts.  The actions to combat the chargebacks are summarized in a Chargeback Prevention Document that was signed by Chris Seidel, the president of Consumer Loyalty Group, in March 2007, and was used to explain the company's efforts to Visa.  (Exh. 40).  The actions taken to reduce chargebacks included: (i) minimizing relationships with incentivized traffic providers, (ii) blocking high risk credit card BIN numbers, (iii) blocking customers in certain high-risk countries from making international orders, (iv) redesigning the order pages, (v) sending customers pre-bill and post-bill email notifications in addition to the usual "welcome" order confirmation emails, (vi) contracting with gateway processor, Verifi, Inc., (vii) implementation of Verified by Visa program, and (viii) expansion of customer service department and making customer service available 24/7 to ensure ability of customers to communicate directly with the company.  These efforts are memorialized in a Chargeback Prevention Document.  (Exh. 40).

These efforts to reduce chargebacks were quite successful, and by May 2007, Consumer Loyalty Group showed a tremendous reduction in its chargebacks.  (Exhs. 41, 63, 65).[3]

---

[3]   It is important to note that Visa and Mastercard, which generally require merchants to maintain a chargeback ratio of less than 1%, calculate chargeback ratios by comparing the number of transactions and chargebacks in the current month, even though chargebacks generally relate to transactions from a prior month.  Due to this lagging method of calculation, it takes a significant amount of time for improvement in chargeback performance to be reflected in the ratio.  For example, an influx of a large number of bogus or fraudulent orders from affiliate marketers will take months to overcome because the chargebacks from such orders take place in the subsequent

OC 286,862,798v2

As a result of affiliate marketer fraud, between April and August 2007, more than half of the calls received by Consumer Loyalty Group's customer service department involved complaints from "customers" who had never signed up for or even heard of Online Supplier.  Obviously, a customer who never even signed up or heard of the product could not know the terms and conditions regardless of the fact that they were clearly spelled out on the web order page.

I.      Gugliuzza Leaves Position

In July 2007, Gugliuzza, who still lived more than 150 miles from Commerce Planet's corporate office, decided to leave Commerce Planet and wrote a memo to Hill in that regard.  (Exh. 228).  The memo explained in pertinent part:

> The direct response marketing industry has undergone a significant metamorphosis in traffic generation methods.  Incentivized traffic has lead [sic] to an increase in fraudulent orders.  These low quality orders have a negative impact on processing rates and merchant processing fees.  Unbeknownst to management Q-1, 2007 revenue numbers reflected the benefit of the high volume law quality orders.  The negative impact was not experienced until Q-2, 2007 when a portion of the revenue associated with these orders resulted in refunds.  The fraudulent activity also created increased support costs and advertising expenditures that were realized in Q-2, 2007.  Management as exerted extreme efforts to mitigate this damage and produce successful Q-2, 2007 results.

(*Id.*)  The memo, after explaining Gugliuzza's efforts in this regard, set forth his desire that the company find new management.  (Exh. 228).  He advised the company to hire a president who could work out of the corporate office on a full-time basis.  A search was thereafter conducted and, in November 2007, Gugliuzza resigned as president and was succeeded by Tony Roth.  (Exh. 2000).

---

months, and are compared to the reduced number of transactions after the influx of bad transactions is quashed.

OC 286,862,798v2

J.     Underline{FTC Meeting With Gravitz and Settlement}

In November 2008, the FTC notified Gravitz that he was a target of a federal investigation and thereafter, in February 2009, he and his lawyer met with FTC representatives.  (Exh. 6).  During the meeting, FTC counsel presented a document that purported to reflect the Online Supplier sign-up page, in multiple hard copy pages, successively depicting the sign-up page from top to bottom.  According to the FTC, the exhibit reflected that the terms and conditions of the negative option plan were below the viewable portion of the computer screen absent scrolling.  Gravitz explained that the hard-copy documents misrepresented what was viewable, and that the terms and conditions could be viewed by consumers without scrolling.

Gravitz, despite believing that he had not violated the law, later entered into a settlement with the FTC to avoid the cost and risk of litigation.  (Exh. 25 at FTC CP 004440).  The settlement required Gravitz to cooperate with the FTC in connection with its ongoing investigation.  (*Id.* at FTC CP 004464-004465).   The FTC thereafter drafted a declaration in his name and caused him to sign it.  (Exh. 6).  During a later deposition of Gravitz, he admitted that the declaration was inaccurate in various ways.  (*Id.*)  One such inaccuracy was that it falsely reflected that Commerce Planet commenced selling Online Supplier over the Internet (rather than by telemarketing) when "Gugliuzza started working at the company."  (*Id.*)  In fact, as Gravitz admitted during deposition, Commerce Planet sold Online Supplier over the internet as early as 2004, well before Gugliuzza began serving as a consultant in 2005.  (*Id.*)

K.     Underline{Complaint and Misleading Attachment}

In November 2009, approximately two years after Gugliuzza's departure, the FTC sued Gugliuzza claiming that he, as president of Commerce Planet, knowingly and/or recklessly caused a subsidiary to disclose insufficiently on its website the terms of a negative option membership program.  There is no dispute that the website **did** disclose the membership terms and its recurring fees.  The FTC's lawsuit, however, contended that the disclosures were inadequate and that Gugliuzza knowingly or recklessly

participated in a fraud on consumers.  Specifically, the complaint alleged in pertinent part as follows:

> Although [the website] contained language to indicate that the transaction "involves a negative option" and that consumers "may be liable for payment of future goods and services. . . for $59.95 per month . . . ." in most standard screen configurations that language appeared below the bottom of screen.  *See* Exhibit 2, page 7.  Because the disclosure language appeared below the bottom of the screen, it was possible for consumers to complete the entire transaction without ever having seen it.  As a consequence, consumers may not, and in a substantial number of instances did not, understand that they had been enrolled in a negative option continuity plan, that is, an agreement according to which consumers will be billed monthly for services, whether they used those services or not, unless they affirmatively sought to discontinue the plan.

(Complaint ¶ 18).

Attached to the complaint as Exhibit 2 was a purported depiction of the website page referenced in Paragraph 18.  However, the sign-up page of the website was depicted in three hard copy pages, with the first page of the exhibit depicting no more than approximately half of the top of the page, and each successive page depicting lower portions, until finally there appeared a depiction of the negative option disclosure.  The obvious purpose of displaying the website page in different hard copy pages was to make it appear consistent with the FTC's allegation that "the disclosure language appeared below the bottom of the screen."

17

L.     Deposition of Former Chairman of the Board

In August 2010, the FTC deposed Michael Novielli, the former chairman of NeWave's board of directors.  During the deposition, which was the first of twenty-five depositions taken during the discovery phase of this matter, FTC counsel inadvertently utilized an exhibit that revealed that the disclosure language was above the fold. Specifically, FTC counsel, during the end of his questioning, took from his files documents marked as Exhibit 19.  In so doing, FTC counsel explained what the exhibit was:

> You know what a civil investigative demand is, right?  It's basically
> an administrative subpoena, the FTC sent an administrative subpoena to
> Commerce Planet which requested documents and information from the
> company related to marketing and sales of its Online Supplier product.
>
> Exhibit 19 that I have just handed you is a printout of computer files
> that were produced by Commerce Planet in response to that subpoena.  If
> you look at the last page of the exhibit, it gives you, shows you the files that
> the printouts came from.  Basically these are printouts of HTML files
> produced by Commerce Planet to the FTC and the printed-out files or
> landing pages . . . . I wanted to ask you a couple of questions about this
> landing page which was created on or before August 1, 2006.

(Novielli Depo at 103: 1-20).

The FTC counsel proceeded to ask the witness questions regarding his role in overseeing the marketing of Commerce Planet during his tenure on the board of directors, but not a single question pertaining to what was on the page itself.   Indeed, FTC counsel shortly thereafter concluded his questioning.

Inspection of Exhibit 19 later revealed that, as explained by FTC counsel during the deposition, it was an FTC printout of electronic landing pages it had obtained from Commerce Planet pursuant to a civil investigative demand.  (Exh. 19 at p. 3).  The sign-up page at issue was one of the pages and reveals that the FTC, at 9:58 p.m. the night

18

before the Novielli deposition, printed the electronic page from an FTC computer. (*Id.*) The screenshot, from the FTC's own computer, reveals that the terms and conditions were above the fold. (*Id.*) Not surprisingly, once the FTC attorneys realized their own exhibit showed the disclosures above the fold, the FTC never again used Exhibit 19 in the numerous depositions that followed that deposition.

M.   <u>Deposition of Chief Technology Officer</u>

After the Novielli deposition, the FTC turned over a declaration signed by Ethan Brooks, the former Chief Technology Officer of Commerce Planet. (Exh. 32). The declaration, which discussed various aspects of website at issue, made no mention of the placement of the negative option disclosure referenced in the complaint. (*Id.*)

On January 6, 2011, Mr. Brooks was deposed by counsel for Gugliuzza and was questioned about how the declaration was created. Mr. Brooks explained that in October 2010, FTC counsel requested a meeting with Mr. Brooks at a hotel. At the meeting, FTC counsel, utilizing a laptop, showed Mr. Brooks a video of what the FTC claimed was a screen capture of the website sign-up page. The video made it appear that one would have to scroll down  the page to view the terms and conditions. After the video was played, FTC counsel referenced the fact that the terms and conditions were beneath the fold of the page. In response, Mr. Brooks informed FTC counsel that, in the video, the screen had been set at too low of a resolution and that, had the screen resolution been set correctly, the terms and conditions would be viewable without scrolling.

During the deposition, Mr. Brooks was shown the FTC complaint, including the exhibit that contained three different hard copy pages, successively depicting the sign-up page from top to bottom. Mr. Brooks testified that the exhibit misrepresented the viewable portion of sign-up page as it would be viewable on a computer screen.

Mr. Brooks additionally testified that, after the meeting at the hotel, FTC counsel sent Mr. Brooks a draft declaration for his signature. The declaration made no mention of either the video or the explanation by Mr. Brooks that, contrary the FTC's allegation, the terms and conditions were above the fold.

N.    Retention of Jennifer King by FTC

In September 2010, the FTC retained Ms. King as a consulting expert in the case against Mr. Gugliuzza.  At the time, Ms. King, a self-described "social technologist" -- did not possess any expertise pertaining to negative option disclosures or the placement of such disclosures on a website, and did not even know what negative options were prior to being retained.  (King Depo. at 16:20-23, 27:7-28:4).  Nevertheless, the FTC, in January 2011 -- the same month in which Brooks was deposed -- changed Ms. King status from a consulting expert to a testifying expert.  (*Id.* at 10:19-21).  In her capacity as a testifying expert, Ms. King rendered an opinion that "most" consumers who signed up for the membership would not know they had entered a negative option.  (*Id.* at 72:2-20, 203:15-25).  She rendered this opinion without interviewing a single customer or conducting any empirical analysis.  (*Id.* at 75:12-14; 106:10-19).

During the deposition, King admitted that she had never been retained as an expert previously, had no expertise in FTC compliance or negative option disclosures, and would not feel comfortable holding herself out to private industry as an expert in negative options disclosures.  (*Id.* at 11:8-12:4, 16:14-23, 187:2-188:1).  Indeed, the following colloquy established her scant knowledge of the concept:

> Q: All right.  Have you ever been hired by a company to provide the company with advice on how to -- to do a negative option disclosure?
>
> A: No.  Actually, before I was introduced to this case I wasn't even particularly -- I had not heard the term -- the term of art "negative option disclosure."
>
> Q: Okay.  So prior to September of 2010 you had never heard of the term "negative option disclosure"?

OC 286,862,798v2

A: Not in a way -- not in a meaningful way not I didn't know what it was off the top of my head.  I thought I knew what it was.  I'm certainly familiar with the types, but as a term of practice, I had not heard negative option disclosure in my work.

Q: Okay.  And so -- and I know this may be hard because now, obviously, you do.  But prior to September of 2010 what did you think negative option was, if you remember?

A: Well, I thought it was a very odd term.

Q: And I know -- again, I want you to separate?

A: Yeah.

Q: What you now know from what you knew prior to September of 2010.  If you can't do it, tell me, but if you can, please answer the question.

A: I had a vague sense of what it was, and I would say the closest kind of example I had was the Columbia record and tape club, which I was a member of when I was a child.  So I knew it had something to do with that kind of realm and practice, but I didn't know much more than that.

(*Id*. at 27:23-29:5).

Thus, King had no more than a vague notion of what negative options were in September 2010, when the FTC chose to retain her as a consulting "expert" for a case pertaining to that very topic.  To make matters worse, King, even by the time of her deposition in April 2011, admitted that she is still not an expert in the placement of negative option disclosures and would not feel comfortable holding herself out as one to the private sector.  (*Id*. at 11:8-12:4, 16:14-23, 187:2-188:1).

OC 286,862,798v2

So what expertise does she possess?  Her CV explains it as follows:  "My primary research is an empirical inquiry (utilizing both qualitative and quantitative methods) of how technology impacts information privacy for individuals and institutions."  (Exh. 375).  Her CV proceeds to list eleven publications, each of which relates to privacy issues.  (*Id.*)  The first one cited illustrates this point: "How Different are Young Adults from Older Adults When it Comes to Information Privacy Attitudes and Policies?"  (*Id.*)  The CV also lists seven "Invited Talks & Panels" which, like her publications, all relate to privacy issues.  (*Id.*)  During her deposition, she admitted that she has neither written nor spoken on negative option disclosures.  (King Depo. at 27:4-22).  This makes sense, of course, given that she did not even know what negative option disclosures were prior to being retained by the FTC.

Her lack of expertise -- or even knowledge -- of negative option disclosures is particularly problematic in a negative option disclosure case given that neither the FTC nor private industry has offered specific rules or best practices on how negative options should be disclosed.  For example, Ms. King, during her deposition, stated that, to her knowledge, she knew of no rule that would preclude a company from placing a negative option disclosure at the bottom of a webpage.

> Q: Okay.  And as far as you know, the FTC has never passed a
> rule that precludes a company from placing a negative option
> disclosure at the bottom of a landing page, correct?
>
> A. Have they given specific guidance not to do that; is that
> what you're asking?
>
> Q. (Nods head.)
>
> A. No, not to my knowledge.

(*Id.* at 117:13-16).

OC 286,862,798v2

Later in the deposition, Ms. King further admitted that private industry similarly has not offered guidance, such as best practices, on how negative options should be disclosed.

> Q: We've already discussed that the FTC has not created specific rules regarding how a negative disclosure is to be done, correct?
>
> A: Yes.
>
> Q: Okay.  Is it fair to say that industry -- private industry has not adopted a specific best practice with respect to how a negative disclosure should be done?
>
> A: To the best of my knowledge, they have not.

(*Id.* at 125:17-126:1).

The absence of rules or specific guidance on the placement of negative option disclosures underscores the importance of allowing only experts with appropriate expertise testify on whether such disclosures are understood by consumers.  That King does not possess such expertise was reflected in her responses to the following questions:

> Q: Given that there are no specific rules from the FTC regarding negative disclosures and private industry has not adopted, to your knowledge, best practices regarding negative disclosures, how would a company in 2006 and 2007 know that a particular negative option disclosure violated FTC rules?
>
> A: Well, I think you would have to first start with the circa 2000 guide, which you printed here, Exhibit 377.  And the, working with the guidelines they give, I think you can default to basic human-computer interaction principles at that point and

23

work through -- work through it from that perspective, which is how I approached it in my report.

Q: So what you're saying is that -- and we'll go through your report in detail, but that a company, in order to know whether they were violating the FTC laws would have to apply certain academic principles?

A: Not necessarily academic ones.  Certainly some of the research I cite is based in academia, the books you just brought out, for example, though occupy a space between academic research and practitioner research, and this is a field where there are a lot of practitioners who contribute to the general body of knowledge.

Q: Is it fair to say that how to make a particular negative option disclosure is a gray area?

Mr. Rose [FTC Counsel]: Objection.  Vague.

A: How to make a particular negative option disclosure that it's a gray area?  It's gray inasmuch as there's no book off the bookshelf one can go buy that says here's how to do a negative option disclosure.

Q: Which is why you didn't cite any books that provided clear indication as to how a negative option disclosure should be done, correct?

A: Certainly, yes.

(*Id.* at 126:14-128:4).

OC 286,862,798v2

As reflected by this colloquy, the FTC chose an "expert" who utterly lacks the appropriate expertise to opine on a topic that she herself admitted is a gray area and where there is a lack of written resources -- either from government or private industry -- that would enable her to quickly learn about the topic after being retained for this case.

O.      Not A Single Percipient Witness Believed Terms Were Deceptive

Jennifer King admitted, during her deposition, that she did not interview a single customer, much less any of the former executives of Commerce Planet or its subsidiaries. Gugliuzza always believed that the disclosures regarding the negative option were adequate.  (Exh. 2000).  No one ever communicated to him a belief that the website was misleading.  Moreover, Gugliuzza understood and at all times believed that the disclosure was "above the fold" on the sign-up page.  (*Id.*)  Contemporaneous communication by Gugliuzza makes this manifest.  (*Id.*)  On April 5, 2007 Gugliuzza attached a screenshot of the sign-up page to an email he sent to Michael Hill ("Hill") and Gravitz.  (Exh. 2002). The screenshot from Gugliuzza's computer clearly shows the negative option disclosure was visible without scrolling.  (*Id.*)

During the discovery phase of the case, the many percipient witnesses who testified on the topic, including those on the FTC's witness list, confirmed that they believed that the disclosures regarding the negative option were adequate or that they were unaware of any deception or unfairness regarding the marketing of Online Supplier. Moreover, not a single witness (FTC employees and retained experts excluded) has testified in this case that he or she ever believed that the Online Supplier webpages were unfair or deceptive.

- The customer service manager of CLG, the Commerce Planet subsidiary that sold Online Supplier, testified that he believed the disclosures were adequate:

    Q. And did you believe that the disclosures of terms and conditions during the online order process were adequate so that the customer should have understood the monthly program?

    . . .

1      A. In my opinion they were adequate.

2      (Guardiola Depo. at 33:21-34:11).

3    • Paul Huff, Commerce Planet's in-house counsel similarly testified that the

4      disclosures were such that Online Supplier customers knew what they were

5      buying:

6          Q. . . . So I'm just asking in the generic sense of the word, have you

7          ever said to yourself, wow, that's unfair or deceptive?

8          A. There is -- there was definite things that I thought could make

9          [the terms of the negative option] more conspicuous, but I think

10         you know, if I was -- when I looked at it, I'm coming from outside

11         the industry, I thought if I looked at this, I would pretty much know

12         what I was -- not pretty much. I would know what I was buying.

13         But that's -- that was my personal feeling on it.

14     (Huff Depo. at 147:16-150:24).

15   • Gravitz, the president of Legacy, the subsidiary responsible for marketing

16     Online Supplier, testified that he believed the negative option was clearly

17     disclosed:

18          Q.  Do you believe that that [negative option disclosure] language

19          clearly and conspicuously conveyed to customers what it is that

20          they were purchasing?

21          A. I think it clearly and conspicuously conveyed the billing terms

22          of what they were purchasing.

23     (Gravitz Depo. at 191:18-192:7).

24   • Hill, the CEO of Commerce Planet, testified that the terms and conditions of the

25     Online Supplier offer were disclosed on the initial webpage prior to purchasing

26     and that "at no time were they meant to be out of sight, [and] out of mind."

27     (Hill Dep., Vol. 2, at 100:19-101:23).  He also stated that he did not believe that

28     he or anyone else at Commerce Planet had done anything wrong or violated any

OC 286,862,798v2

FTC requirements in the marketing of Online Supplier.  (Hill Dep., Vol. 1 at 205:17-206:13).

- Gugliuzza's successor as president of Commerce Planet, Tony Roth, testified that prior to taking on the role as president and CEO of the company, he went through the sign-up process himself and felt that a customer would understand the financial terms.  When he became president and CEO, he never directed anyone to change the layout of the online ordering pages until at least four months later, after the FTC issued a CID.  (Roth Depo. at 53:8-54:6).  Roth also affirmed that he was never aware of any plan to hide the terms and conditions of Online Supplier from customers. (*Id.* at 61:19-23).

- A former outside director of Commerce Planet explained that it was never communicated to him that the company or its subsidiaries considered it in their best interest to mislead consumers.  (Cruttenden Depo. at 52:3-9). He further explained that he felt Commerce Planet was charging a fair price for its Online Supplier product. (*Id.* at 32:18-33:24).

- The President of CLG explained that Commerce Planet and CLG were not trying to deceive consumers into becoming members of Online Supplier and had no incentive to do so:

  > Q.   So because the company was trying to avoid chargebacks, the company had a disincentive to deceive potential customers into ordering Online Supplier or other continuity products; is that right?
  >
  > A.   Yes.
  >
  > Q.   So Consumer Loyalty Group and Commerce Planet did not try to deceive people into becoming customers, right?
  >
  > A.   No.
  >
  > Q.   It's correct?
  >
  > A.   That's correct.

  (Seidel Depo. at 30:20-31:11, 88:18-89:4).

OC 286,862,798v2

- Conrad, outside counsel to Commerce Planet, who had reviewed the Online Supplier signup page for legal compliance and handled customer complaints, explained that the complaints were not disproportionate to the number of customers and that it never came to his attention that the negative option disclosure was insufficiently conspicuous:

> Q.   Okay.  What I'm asking you is, did you ever come to the conclusion, based on reviewing all these complaints that was in your job description -- did you ever come to the conclusion that customers were routinely complaining that they had missed the disclaimer and were ignorant of the fact that they needed to cancel in order to avoid monthly charges?
>
> A.   I don't think I came to any conclusion.  I just -- the complaints were very general in nature, and  I -- basically asking for refunds. I mean, there wasn't -- they didn't state usually the reason why they were requesting it.
>
> . . .
>
> Q.   Did it ever strike you that the number of complaints was out of proportion to what you would expect in a -- in a company with hundreds of thousands of customers?
>
> A.   No.
>
> Q.   Did it ever -- as the person who was receiving these complaints, did it ever strike you that the company must be doing something wrong to be generating the number of complaints that you were receiving?
>
> A.   No.
>
> . . .
>
> Q.   . . . During the time that you were acting as legal counsel on any aspect of NeWave or Commerce Planet, all the way up

CASE NO. SA CV 09-01324 CJC (RNBx)
DEFENDANT'S TRIAL BRIEF

OC 286,862,798v2

1   through early 2007, did it ever come to your attention that anyone

2   ever thought that the disclosure on the Online Supplier web page

3   was deceptive or misleading?

4   A.  I don't recall it ever being discussed.

5   Q.  During the entire time that you were involved with the

6   company, up until early 2007, did it ever get brought to your

7   attention that anyone ever thought that the disclosure on the

8   website was not clear and conspicuous enough for customers to be

9   aware of it?

10   A.  It was not brought to my attention, no.

11   Q.  From any source, right?  It was never brought to your attention

12   from any source that the disclosure on the website about the

13   negative option was not conspicuous enough for people to see it

14   and understand it; is that true?

15   A.  That's true.

16   Q.  So no attorneys general of any states ever made that claim to

17   you, right?

18   A.  Correct.

19   Q.  The FTC never made that claim to you, right?

20   A.  Correct.

21   Q.  And customers never made that claim to you, right?

22   A.  Correct.

23   [objection by FTC counsel]

24   Q.  Did any customers ever make a claim to you that they -- that

25   the disclaimer of the negative option on the web page of Online

26   Supplier was something that they didn't notice?

27   A.  I never received a complaint, no.

28   (Conrad Depo. at 99:12-100:4, 112:14-116:6, 117:6-15, 119:9-120:18; *see* Exh. 110

(Conrad reviewed the OnlineSupplier sign up page and suggested only a disclaimer explaining the lack of relationship to eBay).

P.     Expert Testimony Further Establishes That Disclosures Were Adequate

Kenneth J. Eisner ("Eisner"), an expert in electronic commerce, evaluated the disclosures on the Online Supplier webpages at issue and explained how the negative option was presented in a reasonable manner that consumers could understand. (*See* Exh. 345 at 7-12, 15-17).  Eisner's conclusions counteract any suggestion of unfairness or deception.  Specifically, he concluded that:

- Online Supplier advertised itself as a membership organization and, as such, he would expect that the vast majority of customers would expect to pay membership fees.  (*Id.* at 8).

- customers would realize that the advertised free trial would be followed by a time for payment should the customer continue to receive benefits. (*Id.* at 8-9).

- the language on the Online Supplier webpage disclosing the negative option was readable and reasonably proximate to the buttons customers would use to move on to the next stage in the ordering process. (*Id.* at 9-10).

- the Online Supplier terms and conditions clearly explain the negative option and the associated monthly charge. (*Id.* at 10-11).

- the Online Supplier disclosures were similar to those of Doba.com, an unrelated company in a similar line of business that uses negative option marketing with a similar web order process, and has long maintained an "A+" rating from the Better Business Bureau. (*Id.* at 15-16).

To further illustrate the absence of unfairness or deception, a nationally representative internet survey was conducted of 1,065 American internet users to measure the clarity and fairness of the disclosures at issue. (Exh. 333 at 2-4).  Survey respondents were shown the Online Supplier webpages (and other information that was provided to Online Supplier customers) and asked questions about their understanding of the terms of the Online Supplier offer. (*Id.* at 2, 4). The results of this survey were the

OC 286,862,798v2

1  subject of a report by an expert witness, Kenneth R. Deal. Ph.D.[4]

2      The survey found that the vast majority of respondents understood the negative

3  option.  Specifically, 90.6% of respondents understood after viewing the Online Supplier

4  webpage that a consumer's credit card would be charged for additional goods and

5  services unless the consumer notified Online Supplier that he did not wish to receive the

6  good and services. (*Id.* at 11).  Further, 87.1% of respondents understood how much the

7  consumer would be charged each month ($49.95) if he did not cancel the offer. (*Id.* at

8  11).  "Estimates based on the 1065 person sample are accurate within plus and minus 3.0

9  percentage points or less with 95% confidence."  (*Id.* at 2, 4).

10     The survey results comport with the contemporaneous evidence regarding the

11  behavior of Online Supplier customers.  A database of Online Supplier customer

12  information shows that of the customers who ordered Online Supplier online during

13  January 2005 through April 2008:

14  - 46.32% cancelled their memberships within the free trial period, illustrating

15     that, rather than being deceived, they understood the negative option

16     disclosures and the need to cancel to avoid membership fees.  (*See* Exh. 371, at

17     3).

18  - 26.77% of customers maintained their memberships active for over 60 days and

19     19.7% of customers maintained their memberships active for over 90 days (2

20     and 3 monthly charging cycles, respectively), showing that they were aware of

21     and consented to Online Supplier's monthly membership fees.  (*Id.* at 3, 6).

22  ///

23  ///

24  ///

25  ///

26  ///

27

28

---

[4] The Court granted a motion *in limine* to exclude Dr. Deal's testimony on January 23, 2012.

OC 286,862,798v2

III.    <u>CONCLUSION</u>

Based on the foregoing, Gugliuzza, at the end of trial, will seek a dismissal of this action.

Dated:  January 24, 2012                    GREENBERG TRAURIG, LLP


                                            By:_____*/s/ Wayne R. Gross*_____
                                            Attorneys for Defendant Charles Gugliuzza

OC 286,862,798v2

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is **3161 Michelson Drive, Suite 1000, Irvine, CA  92612.**

On the below date, I electronically filed the **DEFENDANT'S TRIAL BRIEF** with the Clerk of the United States District Court for the Central District of California, using the CM/ECF System.  The Court's CM/ECF System will send an email notification of the foregoing filing to the following parties and counsel of record who are registered with the Court's CM/ECF System:

| | |
|---|---|
| David M. Newman<br>Eric D. Edmondson<br>Evan Rose<br>Kerry O'Brien<br>Federal Trade Commission<br>901 Market Street, Suite 570<br>San Francisco, CA 94103<br>Telephone: (415) 848-5100<br>Facsimile: (415) 848-5184<br>dnewman@ftc.gov<br>eedmondson@ftc.gov<br>erose@ftc.gov<br>kobrien@ftc.gov<br>*Attorneys for Federal Trade Commission* | Raymond E. McKown<br>Federal Trade Commission<br>10877 Wilshire Blvd., Suite 700<br>Los Angeles, CA  90024<br>Telephone: (310) 824-4343<br>Facsimile: (310) 824-4380<br>Email: rmckown@ftc.gov<br>*Attorneys for Federal Trade Commission* |

☒ **(BY ELECTRONIC SERVICE VIA CM/ECF SYSTEM)**
In accordance with the electronic filing procedures of this Court, service has been effected on the aforesaid party(s) above, whose counsel of record is a registered participant of CM/ECF, via electronic service through the CM/ECF system.

☒ **(BY EMAIL)**
Based on court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

PROOF OF SERVICE

☒   **(FEDERAL)**        I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 24, 2012, at Irvine, California.

                                    _/s/  Wayne R. Gross_____
                                    Wayne R. Gross

- 2 -

PROOF OF SERVICE