SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

4                 **CERTIFIED TRANSCRIPT**

5                    - - - - - - -

6   FEDERAL TRADE COMMISSION,        )
                                     )
7            Plaintiff(s),           )
                                     )
8        vs.                         ) No. SACV 09-1324-CJC
                                     )    PRETRIAL CONF.
9   COMMERCE PLANET INC. ET AL,      )
                                     )
10           Defendant(s).           )
    _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 PRETRIAL CONFERENCE

16                SANTA ANA, California

17             MONDAY, JANUARY 23, 2012

18

19
    *Maria Beesley-Dellaneve, RPR, CSR* 9132
20  *Official Federal Reporter*
    *Ronald Reagan Federal Building, room 1-053*
21  *411 West 4th Street*
    *Santa Ana, California 92701*
22  *(714) 564-9259*

23

24

25  2012-01-23

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   **APPEARANCES OF COUNSEL:**

2   FOR THE PLAINTIFF(S): FEDERAL TRADE COMMISSION
                          BY:  DAVID NEWMAN, ESQ.
3                         and  ERIC EDMONDSON, ESQ.
                               KERRY O'BRIEN, AAL
4                               EVAN ROSE, ESQ.
                          901 MARKET STREET, SUITE 570
5                         SAN FRANCISCO, CALIFORNIA 94103
                          (415) 848-5100
6

7
    FOR THE PLAINTIFF(S): FEDERAL TRADE COMMISSION
8                         BY:  RAYMOND MCKOWN, ESQ.
                          10877 WILSHIRE BLVD., SUITE 700
9                         LOS ANGELES, CALIFORNIA 90024
                          (310) 824-4343
10

11
    FOR THE DEFENDANT(S): GREENBERG TRAURIG, LLP
12                        BY:  WAYNE GROSS, ESQ.
                          and  MICHAEL PIAZZA, ESQ.
13                              ALAN GREENBERG, ESQ.
                          3161 MICHAELSON DRIVE, SUITE 1100
14                        IRVINE, CALIFORNIA 92612
                          (949) 732-6500
15

16

17

18

19

20

21

22

23

24

25

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1          **SANTA ANA, CALIFORNIA, MONDAY, JANUARY 23, 2012**

2                           **PRETRIAL CONF.**

3                              (1:27)

4          THE CLERK:  Item six, SACV 09-1324-CJC.  Federal Trade

5  Commission versus Commerce Planet, Inc. et al.

6          Counsel, please state your appearances for the record.

7          MR. EDMONDSON:  Eric Edmondson for the Federal Trade

8  Commission.

9          MR. NEWMAN:  Dave Newman for the Federal Trade

10  Commission.

11          MR. ROSE:  Evan Rose for the Federal Trade Commission.

12          MS. O'BRIEN:  Kerry O'Brien for the Federal Trade

13  Commission.

14          MR. MCKOWN:  Raymond McKown for the Federal Trade

15  Commission.

16          THE COURT:  Good afternoon.  Are we going to have all

17  five of you having a role at the trial?

18          MR. EDMONDSON:  Yes, sir.

19          THE COURT:  Okay.  All right.

20          MR. GROSS:  Good afternoon, Your Honor.  Wayne Gross,

21  Alan Greenberg, and Michael Piazza for the defense.

22          THE COURT:  Good afternoon to all of you.

23          Okay.  There are several things I know we need to

24  discuss today.  Let me go over my list and then once I'm done with

25  my list, you guys can give me your list.  I just want to confirm

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1    that, first of all, the case is ready to go to trial.

2            I'll start off with the F.T.C.

3            MR. EDMONDSON:  Yes, Your Honor.  We're ready to

4    proceed.

5            MR. GROSS:  Defense is ready as well, Your Honor.

6            THE COURT:  Just for planning purposes, is there going

7    to be any further settlement discussions or we both concluded

8    they're done?

9            MR. EDMONDSON:  Well, Your Honor, the Federal Trade

10   Commission is always willing to entertain further settlement

11   offers, but at this point we have nothing to consider.

12           THE COURT:  Are you even talking anymore from your

13   standpoint?

14           MR. EDMONDSON:  Not at present, Your Honor.

15           THE COURT:  Okay.

16           MR. GROSS:  I believe we have exhausted settlement

17   discussions, Your Honor.

18           THE COURT:  Okay.  Good enough.  That's what I needed to

19   know.

20           What I want to then turn next to is the motions in

21   limine.  What I would do is go over the F.T.C. motions first.

22   I'll give you my rulings on the four of those motions.  I believe

23   there are four.  And then I'll hear from everybody on those.  And

24   then I'll give you my rulings on the three from the defense and

25   then hear from everybody on those.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1        The first motion, at least, I have in my stack here is

2   the motion to exclude expert testimony of Dr. Kenneth Deal.  I was

3   inclined to grant that motion.  I believe the defendant failed to

4   make the necessary disclosures for Mr. Bernthal that are required

5   by Federal Rule of Civil Procedure 26.  Defendant's failure in

6   this regard was not substantially justified or harmless.

7   Plaintiff has been denied the discovery necessary to prepare a

8   meaningful cross-examination of Mr. Bernthal about the

9   methodology, design and reliability of the Kelton survey.

10        The next motion I have is motion to admit consumer

11  complaints pursuant to Federal Rule of Evidence 807.  This is

12  maybe a little ambiguous how I'm going to rule, but I'm going to

13  deny the motion without prejudice.  I will allow the F.T.C. at

14  trial to present the consumer complaints, and then I'll make the

15  evidentiary decision after I have heard the evidence.  Whether I

16  will receive it for the truth or for the consumers' states of

17  mind, or to establish the fact that the complaints were in fact

18  made.  Consumer complaints are certainly admissible to show what

19  consumers believed as opposed to the truth of what they believed.

20        The next motion I have is motion to exclude testimony

21  and rebuttal testimony related to certain affirmative defenses and

22  counterclaims.  Denied without prejudice.  Defendant can present

23  evidence regarding his stricken defenses and counterclaim, if that

24  evidence is relevant to his defense against plaintiff's claims.

25        Notwithstanding the foregoing, the Court does not see

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   how evidence regarding his settlement negotiations with plaintiff

2   or plaintiff's decisions on who to investigate or sue are relevant

3   to his defense.  Plaintiff is encouraged to object at trial if it

4   believes defendant is going astray in presenting irrelevant

5   evidence.

6          And then the final motion of the plaintiffs is the

7   motion to exclude expert and rebuttal testimony of Stefano Vranca.

8   I have granted in part.  Restitution is not limited to the

9   consumer loss only in a defendant's possession.  It covers all

10  amounts paid by consumers to defendants.  However, the Court is

11  inclined to allow Mr. Vranca to testify as to the extent of a

12  defendant's profit from wrongful conduct is relevant to the scope

13  of injunctive relief separate and apart from restitution and the

14  issue of the defendant's knowledge of wrongdoing.

15         Given those were the plaintiff's motions, I'll hear from

16  the plaintiff first.

17         MR. EDMONDSON:  Your Honor, we have nothing further to

18  add to our pleadings at this time.

19         THE COURT:  Okay.  All right, then I'll turn it over to

20  the defense.

21         MR. GREENBERG:  Thank you, Your Honor.  Alan Greenberg

22  for the defendant.

23         I would like to address first the motion regarding

24  Dr. Deal.

25         THE COURT:  Okay.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1              MR. GREENBERG:  The first one.

2              THE COURT:  Yes.

3              MR. GREENBERG:  I think there has been some confusion I

4    want to try to clear up for the Court.

5              THE COURT:  All right.

6              MR. GREENBERG:  Mr. Bernthal whose company Kelton

7    Research conducted the survey in the field was deposed by the

8    F.T.C. in this case.  He was made available as a witness and he

9    testified freely as to every question that was asked of him with

10   regard to how the survey was conducted from soup to nuts.

11             THE COURT:  But that's not what was said in the motion

12   papers.  They said they didn't get the disclosure and they were

13   restricted in asking him about his methodology, design and

14   reliability of it.

15             MR. GREENBERG:  Let me explain where the minds are not

16   meeting here.  Mr. Bernthal was not designated as an expert

17   witness because he is not being offered as an expert witness.  In

18   fact, he really was not being offered as a witness at all.

19             THE COURT:  But his survey is expert opinion, right?

20   And that's what your expert is relying on.  So you can't backdoor

21   the underlying survey that way.  If your testifying expert is

22   going to rely on the survey, then the underlying survey needs to

23   be part of an expert opinion.

24             Kind of a similar analogy, you see this a lot in

25   trademark litigation, survey evidence of this type.  And usually

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  your testifying expert is the one who is intimately involved in

2  the preparation of a survey.  I understand that that wasn't done

3  here.  That doesn't have to be done.  But I still think you need

4  to have the person who prepares the survey be designated as an

5  expert.

6           MR. GREENBERG:  Well --

7           THE COURT:  It's expert opinion.  It's not a competent

8  witness who saw something.  You are trying to get in expert

9  testimony.

10          MR. GREENBERG:  Dr. Deal is an expert and has been

11  admitted as such in other courts as an expert in reviewing and

12  commenting on and interpreting survey evidence.  And he, as an

13  expert witness, was deposed.  He has made a report on this survey

14  and on his findings regarding this survey.  Mr. Bernthal --

15          THE COURT:  It's a question.  I'm not trying to argue

16  with you.  Do you have any case authority that has allowed

17  Mr. Deal or any expert to rely on an expert survey that that

18  expert didn't prepare?  You understand?

19          First of all, let's make sure you and I understand what

20  my concern is.  I have never seen a situation like you are

21  suggesting.  I have seen one expert rely on another expert's work,

22  but both of those experts are disclosed, and the reports and

23  everything is done.  I have never seen a situation where one

24  expert relies on an expert opinion of another and that expert is

25  not disclosed.

                    SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.


1        MR. GREENBERG:  I understand what the Court is saying.

2    Let me back up for a second and explain why it was done the way it

3    was done and why it makes sense.  Mr. Bernthal's company did a

4    survey.  They're in the survey business.  Mr. Bernthal -- Dr. Deal

5    is an expert in surveys and reviewed the survey and did a report

6    on the survey.  Mr. Bernthal was made available as a witness and

7    testified in full regarding how the survey was conducted, which is

8    the underlying evidence that Dr. Deal used to come to his

9    opinions.

10        The F.T.C. was able to fully cross-examine Mr. Bernthal

11   on how the survey was conducted.  Here is where the minds weren't

12   meeting, and here is what they're saying he would not testify

13   about.  He would not testify about his theories or the theories of

14   the people who work for him in terms of why they didn't do the

15   survey differently, or why they didn't -- or how they do other

16   surveys in other cases.  Theoretical questions he did not answer.

17   But he did answer every question about how this survey was

18   conducted; how the people were selected for -- the participants

19   were selected to participate in the survey; how the survey was

20   fielded.

21        The F.T.C. got all of the raw data from the survey

22   showing the survey participants' realtime responses to the

23   questions.  They could massage that information and slice it and

24   dice it anyway they want to figure out participants in the survey

25   and their demographics juxtaposed with how they answered the

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   question.  They have all of that as does Dr. deal.  And Dr. Deal

2   gave an opinion about that survey and his interpretation of what

3   the survey means as an expert in marketing and customer surveys.

4        There is no reason why the F.T.C. would need to double

5   dip and ask the person who is not designated as a testifying

6   expert, Mr. Bernthal, whose company did the survey, why they

7   didn't do it a different way.  They have their own expert who can

8   talk about how he would have done it or why he doesn't like the

9   way it was done.  That's their rebuttal expert.  But Dr. Deal, as

10  an expert, has done a report and is intending to testify about, as

11  an expert in surveys, what the significance of this survey is in

12  this case and that the methodology is appropriate.

13       So I understand the Court being confused about that

14  because there's two different layers.

15       THE COURT:  I don't think I'm confused.  And I'm not

16  attacking you for -- I understand what was done.  It's just I

17  didn't think you could do that.

18       MR. GREENBERG:  Well, I don't know why you couldn't do

19  that.  Why would --

20       THE COURT:  Because the survey is expert opinion.  And

21  if there is going to be expert opinion, whether another expert

22  relies on it or not, that expert has to be disclosed.  That's the

23  rules.  I'm not making it up.

24       MR. GREENBERG:  The survey was just a fielded internet

25  survey.  I just want to make sure that the Court understands what

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   was done here.  There is an internet survey.  Everyone has a copy

2   of it.  Everyone knows exactly what the participants saw and

3   exactly what they answered.  There was no interviewing done.

4   There was no in-person survey.  There was no telephone survey

5   where people ask questions.  It's all done electronically.  As a

6   result of that, there is nothing that Mr. Bernthal could say

7   beyond what he already said.

8           It really isn't an expert report that he did.  All they

9   did was conduct a survey that everybody knows exactly what they

10  did.  So there is nothing he could add as an expert beyond what

11  Dr. Deal is saying.  There is no reason to have two experts on the

12  same exact issue.

13          And so, whether in other cases where there is some --

14  because I hear the Court saying that the survey itself is expert

15  testimony, but it's really not.  In this case.  It may be in other

16  cases.  In this case the survey is just a survey.  It is what it

17  is.  It's in black and white.

18          So there is no expert testimony with regard to the

19  actual giving of the survey.  The survey is the survey.  The

20  expert testimony is in the methodology and the interpretation of

21  the survey.  And that's what Dr. Deal is being proffered for, Your

22  Honor.

23          THE COURT:  Okay.  Before we go to the other motions,

24  why don't we hear from the F.T.C.

25          MR. GREENBERG:  Thank you, Your Honor.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1        MS. O'BRIEN:  Good afternoon, Your Honor.  Kerry O'Brien

2   with the F.T.C.

3            The thing I'd like to add is even Mr. Bernthal at this

4   point has not been even named as a witness in this case.  So all

5   they're going to be relying on is Dr. Deal to testify regarding

6   his reading of the result of this survey.  He won't even be able

7   to testify that the survey was actually even conducted in the

8   first place.

9            As we said in our papers, we certainly tried to get

10  Mr. Bernthal to explain why they design a survey the way they did,

11  the purpose behind the survey.  And we were prevented from getting

12  answers to those questions.

13       THE COURT:  So I take it then you still are of the

14  mindset that the survey doesn't get in, and if the survey doesn't

15  get in, then I'm not sure what Mr. Deal has to offer, Dr. Deal.

16       MS. O'BRIEN:  His testimony is limited to just

17  evaluating the results of this survey which aren't admissible.

18       THE COURT:  Okay.  Why don't you give me a sense -- I

19  don't want to assume anything -- give me a sense of what you have

20  been denied in terms of discovery or able to prepare your

21  cross-examination of either Mr. Bernthal or Dr. Deal.

22       MS. O'BRIEN:  Well, again, it's just primarily regarding

23  the design of the study.  Why did they design it the way they did.

24  What was the purpose.  Why this particular target audience was

25  picked.  How does it compare to the consumer base that Commerce

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  Planet had.

2        Those are the kind of questions we wanted to ask to find

3  out if it was properly designed according to generally accepted

4  principles which is the standard, and we were prevented from doing

5  that.

6        THE COURT:  Okay.  Is your expert that you are going to

7  be offering going to be testifying about those aspects of the

8  survey?

9        MS. O'BRIEN:  Well, in terms of that, that's what you

10  would to do.  If you wanted to design a proper study, certainly

11  like, for example, the target audience would have been very

12  important.  And he'll testify that Dr. Deal can't testify to it,

13  and Dr. Shimp doesn't know if it was properly conducted as well.

14        THE COURT:  It is a question.  As an officer of the

15  court, are you aware of any authority that would apply in this

16  situation that would allow this survey to come in without a

17  testifying expert?

18        MS. O'BRIEN:  No, I'm not, Your Honor.  I'm like you.

19  All the cases I saw, usually the testifying expert is also the

20  expert that designed and actually executed the survey.  So they

21  can testify to how it was designed and executed.  Dr. Deal is not

22  going to be able to do either of those things.

23        THE COURT:  All right.

24        MS. O'BRIEN:  Thank you.

25        THE COURT:  Mr. Greenberg, give you the last word, sir.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1          MR. GREENBERG:  Thank you, Your Honor.  Again, I think

2     Your Honor understands from that discussion just now that they

3     have an expert who is going to criticize these issues.  That all

4     goes to weight.  The issue of the admissibility -- and Dr. Deal he

5     has done a report.  His testimony, it's not going to take up any

6     undue consumption of time.  I'm sure he could present his

7     testimony in an hour or so.  But I think that it's important that

8     a survey was conducted and the interpretation of it is relevant

9     evidence for the Court to consider in this case.

10          And again, it goes to weight.  That's what all of the

11     cases say.  That the objections, any objections to the way the

12     survey was put together or the questioning, how it was worded, or

13     how the panel was selected of participants in the survey, all goes

14     to weight and not to admissibility.  And all the cases cited by

15     both sides I think say that.

16          So, it would seem that the proper way to handle the

17     situation would be to have Dr. Deal testify and then the Court

18     could see Dr. Deal cross-examined and determine what weight to

19     give his testimony.  That's all that we're asking, Your Honor.

20          THE COURT:  Okay.  Did you want to argue any of the

21     other motions?

22          MR. GREENBERG:  We kind of split them up.  I was lined

23     up to also handle number two which is the one to admit the

24     consumer complaints.  And because the Court is denying that one

25     without prejudice, I don't know that it's necessary for me to

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  comment any further at this time on that one.

2          THE COURT:  Okay.

3          MR. GROSS:  Your honor, I was going to handle the

4  affirmative defenses motion.  But given your ruling, I don't think

5  we need to spend time on that unless you have any questions for

6  me.

7          THE COURT:  All right.  No, because that was denied

8  without prejudice.

9          MR. GROSS:  Correct.

10          THE COURT:  Then the final one is the testimony of

11  Stefano Vranca.  I don't know, that again was granted in part.

12          MR. PIAZZA:  Yes, Your Honor.  And the only

13  clarification I would ask just to be clear, he will be entitled to

14  give his rebuttal testimony.  His rebuttal.

15          I understand that a portion of the motion has been

16  granted, but there were multiple challenges in that motion by the

17  F.T.C. both as to his credentials, which I think --

18          THE COURT:  That goes to its weight.

19          MR. PIAZZA:  Exactly.  And they never actually addressed

20  his rebuttal report.  So I'm assuming he's going to be allowed to

21  give his rebuttal testimony as submitted in that report.

22          THE COURT:  Well, I didn't spend much time looking at

23  any of the reports because as you know, that's hearsay from my

24  standpoint.  But I think as long as you try to stay close to what

25  my ruling is, that he can talk about, let's see, issues that

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  arguably go to the scope of the injunctive relief, and he can also

2  obviously talk about what your client's knowledge of the

3  wrongdoing, alleged wrongdoing is.

4        MR. PIAZZA:  Very good, Your Honor.  I think we'll

5  submit on that basis.

6        THE COURT:  All right.  Well, then, after hearing

7  everything, I'm going to stick with my decision on all motions in

8  what I perceive to be the controversial one dealing with

9  Mr. Bernthal and Dr. Deal.

10        If the record is not clear, I am a stickler with rule 26

11  and the disclosures.  And I don't believe that you can get that

12  survey in or another expert can rely on it unless the expert who

13  prepared the survey is a disclosed expert and produces the

14  required report and then is subject to cross-examination about his

15  findings and conclusions in that report.  And I do believe the

16  expert survey is an expert opinion that's required compliance with

17  rule 26.

18        All right.  Now, we'll go to defendant's three motions.

19  First I have motion to exclude documents not produced in response

20  to the FOIA request.  After reading the briefs, I am inclined to

21  deny that as moot in that the F.T.C. has represented that they are

22  not going to present any document that was not produced in

23  discovery.  If that's not the case, then obviously I will revisit

24  this motion during trial.

25        The second motion I have is to exclude expert testimony

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  of Jennifer King.  I was going to deny that motion.  Ms. King is

2  an expert in the area of HCI and she is qualified to render an

3  expert opinion as to how typical consumers would interact with the

4  defense's sign-up web pages.  I believe the defendants' objections

5  really go to the weight of the expert opinion, not the

6  admissibility of those opinions.

7        The final motion in limine is the motion to exclude the

8  testimony of Molly Petullo.  Similarly, to the last motion, I was

9  going to deny that.  Ms. Petullo is an expert in the area of

10  affiliate marketing, and she is qualified to render relevant

11  opinions to rebut the expert opinions of Mr. Eisner on the subject

12  of affiliate marketing fraud.  Her opinions are not inadmissible

13  even if they might embrace an ultimate issue for the Court.

14        I would refer everyone to rule 704 which allows expert

15  testimony on ultimate issues as long as you are not in a criminal

16  case talking about a defendant's mental state.  I do believe the

17  objections to her testimony go to the weight of those opinions

18  that she has, not their admissibility.

19        Okay.  I think that's all of defendants.  Given these

20  are defendants' motion, I'll hear from the defendants first.

21        MR. GROSS:  Thank you, Your Honor.  I don't think we

22  need to do anything with the FOIA motion at this time so I'll turn

23  to Jennifer king.

24        I typically don't bring Daubert motions, Your Honor,

25  because my usual practice and thought is each side should be

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   entitled to present their case, and usually evidence goes to

2   weight, particularly with experts.  I made an exception here

3   because after deposing both Ms. King and Ms. Petullo, and I spent

4   considerable time with both of them, I came to the conclusion, for

5   different reasons, that they should not be permitted to testify in

6   this case.

7          With respect to Ms. King, she is no doubt intelligent.

8   She is a Ph.D. candidate at Berkeley.  But her expertise, it was

9   quite clear, was on internet privacy policies.  So if this were a

10  case involving issues falling within that category, I would never

11  have brought this motion.  But this case is not about that issue

12  at all.  Instead, this case, from the very beginning, has been

13  about negative option marketing.

14         What I didn't know before -- I knew about her expertise

15  in privacy before I walked into that deposition.  What I did not

16  know was that she would admit under oath on videotape that prior

17  to being retained by the F.T.C. she only had a vague notion of

18  what negative option marketing was.  I almost fell off my chair.

19  And yet, now she is being proposed as an expert on negative option

20  marketing because that's what this case is.  And her testimony,

21  and I think you are right, she is going to testify about how

22  typical consumers would react to web pages, but it's a little more

23  specific than that.  It's how consumers would react to negative

24  option disclosures.

25         And my assertions in connection with this in limine

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   motion, Your Honor, there is no way that an expert, no matter how

2   smart they are in other areas, could possibly opine on that area

3   in this case.

4           She also, during her deposition, and this was to her

5   great credit, admitted that there are no regulations, no better

6   practices that have been articulated by either the government or

7   private industry that she could utilize to get her up to speed

8   before taking the stand in this case.

9           That's not to say there aren't negative option marketing

10  experts.  In fact, we're calling one in our case.  They could have

11  chosen someone with the requisite expertise.  They did not do so

12  here.  And because of those exceptional circumstances, we decided

13  to file a motion seeking to preclude her from testifying.

14          THE COURT:  Okay.  Why don't I hear from the F.T.C.

15  before we go to the other motion and I guess I'll just get to the

16  point.  Does Ms. King have to know about negative option

17  disclosures to be able to give expert testimony on this subject?

18          MR. ROSE:  No, Your Honor.  Because as you pointed out

19  in your ruling, the core of this case is about, we would state, is

20  the net impression of the website and how consumers interact to

21  the website, what they see and don't see.  She is eminently

22  qualified to give that kind of testimony, not only based on her

23  academic credentials, but her eight-year professional career in

24  internet marketing.

25          So we never put her forward as a negative option

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1    marketing expert.  We don't think this case is a negative option

2    marketing case.  It's a failure to disclose material facts case.

3    And she is able to testify that material facts would not have been

4    perceived by consumers visiting those sign-up pages.

5           THE COURT:  It's hard for me to ask real meaningful

6    questions before I have heard her testimony and understand the

7    issue of the case in context.  But I got the sense that your

8    expert, her, particularly Ms. King, is really more about marketing

9    over the internet.  And she is consulted, or people in her field

10   are consulted.  No matter what field, no matter what industry,

11   when they want to approach people and approach consumers and they

12   want to do it over the internet, those companies, those

13   businesses, they contact her to, how is this going to work to be

14   most effective; or how does it work so we stay out of trouble,

15   that we don't mislead.  And then the person doesn't need expertise

16   on knowing the specifics about banking, finance, or whatever the

17   widgets are, the business.

18           Am I oversimplifying it?

19           MR. ROSE:  No, I think that's absolutely right, Your

20   Honor.  It's about how people interact with computer systems.  In

21   this case, websites.  What are they going to see?  What parts of

22   the page do they look at first?  What parts of the page are they

23   likely to miss?  And it's not really, is it a banking site; is it

24   Amazon.com.  It's how do people interact with the site; what are

25   they going to perceive.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1        THE COURT:  What is she relying on to give her opinions

2  on what people are going to perceive, what they're going to miss?

3        MR. ROSE:  She reviewed the sign-up pages in question.

4  And there is a large body of knowledge based on extensive

5  empirical research in the field of HCI that establishes certain

6  heuristic principles about how people view web pages.

7        For example, one of the ones that comes into play here

8  is a widely understood principle that unless compelled to do so,

9  typically users will not scroll to see material at the bottom of a

10  web page.  They don't scroll below the fold, as it's put, to look

11  at parts of the web page that are not presented in the immediate

12  browser window.  So that's one of the principles she brought into

13  play.

14        Other ones have to do with people being unlikely to

15  click on terms and conditions links to view terms and conditions

16  on a separate web page.  That also comes into play here because

17  one of the places that material terms were placed in this case was

18  on a separate terms and conditions web page, which she is able to

19  offer the opinion that those would be ineffective.

20        So it's general principles like that that are based on

21  extensive user testing that experts in her field will apply in

22  various situations to new situations in order to reach these

23  conclusions.

24        THE COURT:  Was that testing and empirical studies, were

25  they done like in the field, or were they just done at a computer

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   lab at a university or what?

2        MR. ROSE:  I think it's both.  This is a field that's

3   intensely practitioner driven.  There is a strong academic

4   component.  That's the area that she is working in now.

5        But for example, she calls him one of the giants in the

6   field, one of the leading experts in the field, Dr. Nielsen.  My

7   understanding, he is not associated with the university.  He does

8   private user testing and sells his books on these principles and

9   does consulting.

10       It's something where it's done both in lab testing, is

11  one way.  Certainly through analyzing log results in web pages.

12  They do ITracking testing.  There's really a variety of research

13  that goes into this.  Again, it's even more heavily practitioner

14  driven than certain other fields.

15       THE COURT:  Has the defense designated an expert on this

16  area as well?

17       MR. ROSE:  Not to my understanding, no.  I mean, to the

18  extent that Mr. Eisner testifies on various issues of how people

19  view web pages.  He also cites to Dr. Nielsen, and he also cites

20  to the conclusion that people are unlikely to read terms and

21  conditions, links, and disclosures to be in the sign-up flow.  I

22  mean, it's all -- I think we cite many of those -- I'm not sure

23  that we do actually in our opposition, but there is plenty of that

24  testimony that we can bring to the Court's attention as well.

25       THE COURT:  So your understanding is, is it Dr. Eisner?

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1          MR. ROSE:  No, it's Mr. Eisner.

2          THE COURT:  He is going to talk about some of the

3  subjects that Ms. King will be talking about, or the principles?

4          MR. ROSE:  He was identified as a rebuttal expert to

5  Ms. King's report.

6          THE COURT:  Does he have, do you know -- I can ask Mr.

7  Gross this when he's back up -- does he have any expertise in

8  negative option?

9          MR. ROSE:  I believe he claims to have expertise in

10  negative option marketing, yes.

11          THE COURT:  Okay.  All right.

12          Mr. Gross, give you the last word on this motion.

13          MR. GROSS:  One of the questions that I had for Ms. King

14  during her deposition was what is it that she would be testifying

15  about at this trial.  And she testified at her deposition that, as

16  she had in her report, that most consumers would not see this

17  particular disclosure based on her so-called expert testimony on

18  this negative option marketing issue.  She then admitted that she

19  hadn't conducted any empirical analysis.  They refer to user

20  testing.  What user testing?  There is none.

21          She cited a couple of books.  And I read those books and

22  I brought them with me.  One of authors of those books was this

23  Mr. Nielsen.  She admitted, however, that aside from those books

24  she has done nothing.  So we have an expert who, before being

25  retained by the F.T.C., didn't even know what negative option

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  marketing was, then comes into this case.  And it's a very serious

2  case.  They're seeking to hold a former executive of a public

3  company liable for $40 million.  And they're going to have this

4  woman testify under oath that most consumers would not see a

5  disclosure about a topic of which she was completely unaware

6  before being retained?

7          THE COURT:  I think this is the way I'm going to come

8  out on it.  I'm going to allow her to testify, Mr. Gross, but I

9  will deny your motion without prejudice with respect to Ms. King.

10  And after I have heard her testimony, heard the cross-examination,

11  and then maybe even heard Mr. Eisner, I will reconsider whether I

12  should take her testimony and then evaluate it and weigh it, or

13  whether it's really proper expert testimony.

14          But I don't feel comfortable making the decision of

15  excluding an expert that has been disclosed based on a motion in

16  limine record.

17          MR. GROSS:  That makes sense to me, Your Honor.

18          Turning to Molly Petullo, she presented other

19  interesting issues during her deposition.  And I am with Your

20  Honor with respect to rule 704.  I understand the ultimate issues

21  question.  But here is what struck me about her, and I have never

22  seen this before.  She went into this deposition.  And on her own,

23  I wasn't asking her leading questions, at least not at the outset

24  in connection with the legal nature of her opinions, but she was

25  unequivocally rendering legal opinions about whether the

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1    disclosures at issue violated the F.T.C. Act.  Whether third party

2    affiliates were engaging in conduct for which the defendant should

3    be legally responsible.

4            And I gave her a number of opportunities to back away

5    and say no, these are not legal opinions.  And aside from one

6    brief comment after a break where she said well, maybe not, in

7    every other instance, she's basically said under oath, these are

8    my legal opinions.  She is not a lawyer.  There is nothing in her

9    background reflecting that she would have any expertise as a

10   non-lawyer such that she could render, under rule 704, opinions

11   that go to the legal issues that are the crux of this case.

12           So it was that testimony of Ms. Petullo that caused us

13   to make the decision to file a Daubert motion with respect to her.

14           THE COURT:  Okay.  Who is handling this one?

15           MS. O'BRIEN:  As we mentioned in our opposition, we're

16   not putting forth Ms. Petullo as a legal expert.  The references

17   that Mr. Gross made about her testimony in her deposition were in

18   the context of her rendering opinion as to if she was a compliance

19   officer now and an affiliate network, would the online supplier

20   advertising pass that compliance program.  And one of the factors

21   she takes into account when she is evaluating an online ad is

22   whether she thinks it would violate the F.T.C. Act, for example.

23           THE COURT:  Okay.  I'm not opposed to you having her

24   testify.  Maybe a simpler way to talk about it, I have civil

25   rights cases all the time, and you have an expert from the defense

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   always testify about what is proper force and was it excessive.

2   And the general opinion .you know they're going to say it

3   excessive.  The key is, is the details.  What are the findings,

4   the sub-opinions to support this general opinion.

5       I assume she is going to have the basis for any general

6   opinion she gives.

7       MS. O'BRIEN:  Right.  I mean, in her declaration that we

8   submitted in conjunction with our opposition, she lists all of her

9   bases for her opinion that it wouldn't comply with any compliance

10  program that she ever worked on, for example.  The fact that they

11  use the EBay logo in advertising, she found that would probably

12  violate, for example, the F.T.C. Act and cause problems for any

13  affiliate network she was working with.

14      THE COURT:  Okay.  All right.  I'm going to stick with

15  my decision on this one.

16      I understand, Mr. Gross, your concerns and your

17  reservations.  And certainly when it comes time to determine how

18  much weight to give her opinion, I will certain take those into

19  account.

20      I believe that deals with all the motions in limine.

21  What I was going to turn to next is some of the ground rules for

22  the trial.

23      First, I'd like to confirm what the estimate is.  It is

24  a bench trial.  But I would still want us to be as efficient as we

25  possibly could be.  I don't have -- I should probably have brought

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   my calendar and I can get it to the bench.

2          Maybe Michelle, you can help me.  Are there any days in

3   the next couple of weeks that I should be sensitive to once the

4   trial starts on the 31st?  Any days in February that I am not

5   going to be in?  I know I have a big case with the ACLU and the

6   government on the 10th of February.  So we will be dark that day.

7   And then I believe I am also in Fresno sitting by designation on a

8   case, the Ninth Circuit asked me to, the 23rd and 24th.

9          And then obviously we're not in session on Mondays.

10  That's when I do everything else.  So I was hoping to be in

11  session the rest of those days, Tuesday through Friday.

12         Now that we have a better sense I guess of the case, how

13  much time is the plaintiff going to need to present its case?

14         MR. EDMONDSON:  Well, Your Honor, that depends on a

15  couple of things.  One, we have proposed offering some of the

16  testimony in written form.  Since this is a bench trial, it's my

17  understanding that's not an uncommon way to proceed in bench

18  trials.  We would offer some of the testimony in written form,

19  have the witness adopt the testimony and provide maybe a bit of

20  further testimony on specific points and then be available for

21  cross-examination on all testimony.

22         THE COURT:  Let me interrupt you even before I hear from

23  anyone from the defense.  I don't like that and I don't want to

24  get in trouble of disparaging any of my colleagues, because

25  everybody has their different view on what they want to do.  I

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  only tried that once, and I tried it against my instinct.  And it

2  just doesn't make sense.  Because I wonder at the end of the day

3  if you have sophisticated lawyers and meaningful cross-examination

4  and meaningful redirect, I'm wondering what we really achieve by

5  going through all the time and effort of getting something in

6  writing, in a declaration.

7           Also, I'm a little bit of a traditionalist and a

8  dinosaur and I always believe that what a person says live, under

9  oath, can be sometimes different and articulated differently in

10  writing as opposed to in open court.

11           So, although I greatly appreciate -- and I'm not just

12  saying that -- your interest in trying to streamline things, and I

13  do know of judges in this courthouse who are very well-respected,

14  especially in the civil area, that do exactly what you are saying,

15  they require that.  I'm not one of those judges.  I don't

16  subscribe to that.

17           MR. EDMONDSON:  Okay, Your Honor.  The other issue is,

18  frankly, whether we're able to achieve some agreement with

19  defendants on foundational issues.  A number of our proposed

20  witnesses would be offered simply to lay a foundation for

21  documents.  And if witnesses -- if defendants are willing to

22  stipulate to their admissibility, or at least waive any hearsay

23  objection, for instance, on certain documents, then we can cut

24  down our witness list.

25           THE COURT:  Are these documents, what are they, business

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

 1  records or public records?

 2          MR. EDMONDSON:  Primarily e-mails.

 3          THE COURT:  And they're not a hearsay problem because

 4  what, they're business records?  Or are they being offered not for

 5  the truth or both?

 6          MR. EDMONDSON:  They're not business records.  They

 7  would be offered for the truth, or possibly offered, as in some

 8  cases, to show that the defendant had notice of certain practices

 9  or certain relevant issues?

10          THE COURT:  I guess until I see these types of

11  e-mails -- but if you are saying it's for notice, then it's not

12  being offered for the truth.

13          MR. EDMONDSON:  So it could come in without testimony

14  then.  Okay.

15          THE COURT:  Okay.  Well, I don't know how many documents

16  we're talking about, but obviously it's in both sides' best

17  interest to save their advocacy for argument.  And to the extent

18  you can agree on the admission of documents, I strongly encourage

19  both sides to do that because I don't want to do it the Judge

20  Carter way.

21          Mr. Gross, you are familiar with Judge Carter.  The last

22  thing I want to do is be dragging you in here at 7:00 in the

23  morning or late at night or a weekend.  And I don't do that, but I

24  have had to do it on occasion.  And I'm not happy when I have to

25  do it, and I know you won't be happy.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1        So all I ask is try to cooperate and try to simplify it.

2   With the understanding that you will get some stipulations from

3   the defense on those documents which you think clearly are

4   admissible for whatever reason, for whatever purpose, how long do

5   you think it's going to take you to put on your case?

6        MR. EDMONDSON:  At present, Your Honor, I would say 10

7   to 12 days.

8        THE COURT:  That's a long time.  Again, I don't know

9   much about your case and I don't feel comfortable critiquing or

10  saying gosh, you need that much time, but 12 days, without

11  holidays, that would be a three-week trial.

12       And I assume defense are going to need somewhat

13  equivalent to that much time?

14       MR. GROSS:  I don't believe we'll need that much time,

15  Your Honor.  We'll do everything we can to make this as efficient

16  as possible.

17       THE COURT:  Okay.  All right.  Well, then, we'll just

18  proceed as we can.  Hopefully we won't have to take a break, but I

19  do have some criminal cases.  But chances are they'll go away.

20  Once we start trial, you'll have precedence over any civil case.

21  So I'm not worried about civil cases.  But if there is a criminal

22  case, we'll just take it as it comes up.

23       But as maybe you already know, I have criminal cases

24  scheduled almost every Tuesday in the month of February.  But

25  whether they actually go is another thing.

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1        MR. EDMONDSON:  Thank you, Your Honor.

2        THE COURT:  Let me give you some of the basic ground

3    rules.  I don't have that many, but there is some that I do want

4    to highlight for you.  One is my two-shot rule.  I call it that.

5    Any witness who testifies, there will be two examinations from

6    each side.  So the party that calls the witness will do their

7    direct and then redirect.  The party that is not calling the

8    witness will do their cross and recross.  That's it.  Please don't

9    ask me, "I just have one more question."  I won't allow it.  Ask

10   your questions on direct, cross, redirect or recross and that's

11   it.

12        I would ask that -- it would seem to me with respect to

13   every witness except the defendant himself, that that witness

14   should only have to come to court once.  In other words, I don't

15   want any percipient witness being called by the F.T.C. and then

16   once it comes time for the defendant to present his case, call

17   that witness back.  Except for him, himself, that's an important

18   witness, I would understand him wanting to do his examination in

19   his own case.  Please try to cooperate and coordinate witnesses so

20   they don't have to come back twice.

21        Objections.  I do not like speaking objections.  When

22   you make an objection just state the objection and its basis.  For

23   example, Objection.  Hearsay.  Objection.  Argumentative.  Don't

24   start arguing the evidence.  Lawyers will constantly say

25   "Objection, he testifies on direct blah, blah, blah, blah."

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  That's improper and I don't need it.  I know we don't have a jury

2  so maybe I don't have to be as concerned, but I just don't find

3  that productive.  If I need an explanation for any question that's

4  asked, I'll ask for it.

5         So for example, Objection.  Hearsay.  I'll say is there

6  an exception?  Or, are you seeking an answer not for its truth?

7  You don't need to argue the evidentiary objection.

8         The lectern rule is unless there is a witness that you

9  want to come down from the witness stand or there is a document

10  you want to show to the witness, I really like you to ask your

11  questions from the lectern as opposed to standing right next to

12  the witness.  The witness is uncomfortable with that and I'm

13  uncomfortable with it.

14         So if you could stick close to the lectern, I'd

15  appreciate it.  Once we're in trial, I have no problems with a

16  little bit of movement and I have no problems with you walking in

17  the well.  That's not a problem.  But for your own sake, try to

18  stay as close as you can to the lectern.  Maria will come down on

19  you, because once you are away from the lectern, you're not by the

20  microphone.  And it's a beautiful courtroom but the acoustics are

21  not so good when you are not speaking into the microphone and

22  she'll shut you down and say, "I can't hear what they're saying,"

23  nor can I hear what you are saying.

24         Hours of operation.  What I was thinking is that we

25  would start at 8:30 in the morning.  I think the website or my

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1   court rules say 9:00 o'clock, but I have found that we really get

2   a lot more business accomplished if we start just a half hour

3   earlier.  So I would want to start at 8:30 on the 31st.  We'll

4   take a morning break and then we'll break around noon, and we'll

5   take an hour lunch break, pick back up around 1:00, 1:15, and then

6   we'll take an afternoon break, and then we'll quit usually around

7   4:30 each day unless there is a witness that we really want to

8   finish and if we go a few minutes after that, we'll do that.  Very

9   rarely will I want to stay past 5:00 o'clock.

10           I know you won't take this personally, but we have a lot

11   of cases right now and we're very busy right now.  And so when you

12   leave us, our day is not over.  And I need that time to address a

13   lot of other stuff.  Michelle has a bunch of other stuff.  Maria

14   has got other stuff, plus she has to prepare transcripts on this

15   and other cases, and we just have no civilized life if we're going

16   into session until 6:00 or 7:00.

17           That is all I have.  Why don't I start with the

18   plaintiffs to see if there are any questions or issues?

19           MR. EDMONDSON:  No questions, Your Honor.  Thank you.

20           THE COURT:  Mr. Gross, how about your team?

21           MR. GROSS:  Just a couple of house keeping items.

22           THE COURT:  Yes, sir.

23           MR. GROSS:  We're going to, and I think the F.T.C., will

24   be using Trial Director.  We may use the Elmo at times as well,

25   but Trial Director would really help the trial move alone.  There

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

 1  are more than a thousand documents and it will facilitate the

 2  argument and testimony.

 3          What we would like to do is to -- when I say "we," the

 4  defense -- is to bring a screen into the courtroom.

 5          THE COURT:  Great.

 6          MR. GROSS:  And I don't think the F.T.C. objects.

 7          THE COURT:  I think that will be great.  They usually

 8  put it right there.  In fact, most of my significant trials have

 9  brought in a screen.

10          MR. GROSS:  The other issue is we are conferring with

11  the F.T.C. in connection with two witnesses that they have placed

12  on their witness list who appear to us to be non-percipient

13  witnesses.  The expert disclosure, as Your Honor knows, was way

14  back in March.  So depending on how those discussions go, we may

15  be bringing motions to strike.  But if so, we'll give Your Honor

16  notice as well as the F.T.C.

17          THE COURT:  Well, on that point, I don't know what the

18  merits are on what you are saying, Mr. Gross, but I am a stickler

19  about rule 26, as you found out.  What is good for them is good

20  for you and vice-a-versa.  If it's expert testimony and they were

21  not disclosed, they will not be testifying.

22          MR. GROSS:  Thank you, Your Honor.

23          THE COURT:  Okay.  Well, then, I will look forward to

24  seeing everybody on the 31st and we'll start at 8:30.  So if you

25  could get here at 8:15, that will be great.  If you have questions

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1  about the Elmo or any of the other equipment in the courtroom, I'm

2  sure Michelle will be able to answer them for you or set you up

3  with Jonathan who is our technician.

4      MR. GROSS:  One more question, Your Honor.  What is your

5  thought on disclosure of witness order and time in advance of the

6  actual trial day in which such disclosure should be made?

7      THE COURT:  In civil cases I have always relied on the

8  professionalism of lawyers.  And what I have observed is that they

9  have worked that out almost in every case.  And before the trial

10  starts, witnesses will be discussed.  They'll talk about when

11  they're going to be called, especially with the rule that I gave

12  you that I don't want anybody coming back twice.

13      So that's a long-winded way of answering your question

14  is, you are going to work that out for me.  And obviously it can't

15  be meaningful if you are talking about witnesses the day that

16  they're going to be testifying.  You need to be talking about that

17  actually now.  So hopefully you can work that out with the

18  exhibits and with the witnesses now that we have the rest of this

19  week.

20      MR. GROSS:  Thank you, Your Honor.

21      THE COURT:  All right.  Thank you.

22      *(Whereupon the proceedings were adjourned at 2:34.)*

23

24      *-oOo-*

25

SACV 09-1324-CJC - 01/23/2012 - PRETRIAL CONF.

1                        *CERTIFICATE*

2

3         *I hereby certify that pursuant to Section 753, Title 28,*

4   *United States Code, the foregoing is a true and correct transcript*

5   *of the stenographically reported proceedings held in the*

6   *above-entitled matter.*

7

8   *Date:  JANUARY 24, 2012*

9

10  */S/*
    _____
11  *OFFICIAL COURT REPORTER*

12

13

14

15

16

17

18

19

20

21

22

23

24

25